BERGE, Appellant,

v.

COLUMBUS COMMUNITY CABLE ACCESS et al., Appellees.

[Cite as *Berge v. Columbus Community Cable Access* (1999), 136 Ohio App.3d 281.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 99AP–75 and 99AP–76.

Decided Dec. 23, 1999.

282

286

288

292

*Andrew J. Ruzicho* and *Andrew J. Ruzicho II; Robert D. Erney & Associates Co., L.P.A.,* and *Jami S. Oliver,* for appellant.

*Joseph S. Streb Co., L.P.A.,* and *Joseph S. Streb,* for appellee and cross-appellant Columbus Community Cable Access.

*Lane, Alton & Horst* and *Belinda S. Barnes,* for appellee Myron S. Miller.

*Janet E. Jackson,* City Attorney, and *Todd M. Rodgers,* for appellee city of Columbus.

PEGGY BRYANT, Judge.

Plaintiff-appellant, Jon Berge, appeals from a judgment of the Franklin County Common Pleas Court granting (1) a new trial to defendant-appellee, Columbus Community Cable Access, Inc. ("CCCA"), following a jury verdict of $550,000 for plaintiff on his claim of handicap discrimination against CCCA, (2) a directed verdict to defendant-appellee, Myron S. Miller, and (3) summary judgment to defendant-appellee, the city of Columbus.

As a result of a fall from a sixty-foot balcony in college years ago, plaintiff lost the use of his legs. His resulting paraplegia required, and continues to require, that he use a wheelchair. After resuming college in Ohio, plaintiff graduated with a degree in psychology from Wright State University and attempted to enroll in a graduate program at the Ohio State University in the fine-arts department. Plaintiff was denied admission into the program because of a weak art portfolio. In an effort to improve his portfolio, plaintiff took additional classes in the arts and computer graphics. He then moved to Columbus and began to take classes at CCCA in a further attempt to improve his art portfolio.

Pursuant to federal law, municipalities such as the city of Columbus can require cable television operators to set aside channels in their cable systems for public, educational, and governmental use, known as PEG channels. Section 531(b), Title 47, U.S.Code. The municipalities, known as franchising authorities, can then contract out the management of the PEG channels to outside sources. The city contracted with CCCA, a non-profit organization founded in 1980, to run the public access channel in Columbus. While CCCA manages and runs the channel, the channel itself is still owned by the cable operator.

The franchising authority may charge the cable operators a franchising fee of up to five percent of the cable operator's gross revenue to help operate the PEG channels. Section 542, Title 47, U.S. Code. In Columbus, the city charges cable operators three and one-half percent. The millions of dollars collected each year

goes into a cable fund. Approximately eighty-five percent of CCCA's funding comes from the cable fund; for the year 1998, CCCA received more than $300,000. The remainder of the fund either goes to the other entities that run other PEG channels in Columbus or stays within the fund for the city to spend.

CCCA manages Channel 21, the public access channel that Columbus has asked cable operators in the city to set aside for community-based programming. CCCA also teaches members of the public how to use studio technology to create their own television shows to air on Channel 21. Although CCCA is open to the members of the public, the public must register, pay a fee, take classes, and become certified before gaining access to CCCA's studio equipment.

Plaintiff began taking classes at CCCA in 1992. When plaintiff came to CCCA's building for an orientation, plaintiff could not find a wheelchair-accessible entrance. Because the required orientation was held in the basement of the building, an area of the building thirteen steps below the first floor, he was unable to attend the orientation.

Shortly after that trip to CCCA, plaintiff returned for a one-on-one orientation on the first floor of the building with Lucretia Nabb, the training coordinator of CCCA at that time. During the orientation, plaintiff was given a tour of the building, including the bathroom, where plaintiff noticed that the bathroom doorway was not wide enough for his wheelchair.

He was then taken to the studio and shown the stage, which was located in a lower level of the building. Nabb showed plaintiff a ramp going down to the stage, which plaintiff attempted to use. Because of the steep grade of the ramp, plaintiff fell forward, but he used his hands to stop his body from actually falling out of his wheelchair. After touring the stage area, plaintiff attempted to go up the ramp, but could not, due to its steep incline. Nabb ultimately had to push plaintiff up the ramp.

Although the building had a side entrance into the stage area, the path was blocked with moving curtains, cameras, props, and the stage itself. Even if plaintiff had been able to enter through that door, the unusable ramp provided the only access to the main level, where CCCA's offices were located. On leaving the building, plaintiff concluded that the building was not wheelchair-accessible.

A couple of months after his orientation, Nabb called plaintiff to inform him that a computer-graphics teaching position was open at CCCA. After attending some classes to determine whether he could teach the class, plaintiff applied for the position. Before he was offered the job, plaintiff was called to a meeting at CCCA to discuss his difficulties in getting into and working in the building. According to plaintiff, various employees of CCCA were at the meeting, as was Myron Miller, the landlord of the building. Plaintiff advised of various accommo-

dations to assist him in gaining access to, and working in, the building. From the meeting plaintiff concluded that he would have to access the building from the main entrance, which had a flight of three steps going up to the front door and then another flight of three steps past the front door to CCCA's offices.

Weeks after that meeting, plaintiff was offered the teaching job; he accepted the offer, and in June 1992, he began teaching one three-to-four-hour class one day of the week. On his first day of work, Nabb assisted plaintiff up the front entrance by bumping plaintiff up each step: Nabb held plaintiff's wheelchair from behind while tilting plaintiff back to lift his front wheels off the ground and up the steps. After working at CCCA for a while, plaintiff had to wait outside for an employee to assist him up the stairs, sometimes waiting for as long as fifteen to twenty minutes. At some point plaintiff was given a buzzer to use so an employee would know he was outside and would come to help him up the stairs. Throughout plaintiff's tenure as a teacher at CCCA, he complained to many about the lack of handicap accessibility to the building.

On November 7, 1995, Michael Staughter, an employee of CCCA, was helping plaintiff down the front steps of the building. Staughter began tilting plaintiff's wheelchair back to bump him down the steps when, as plaintiff explained, "[w]e continued to go forward, I was tipped back, and I don't know exactly what happened, but we proceeded to go down very quickly, and I continued to go, continued to go back until I actually struck something." Plaintiff's right shoulder struck the ground, leaving a red mark on that shoulder. After the incident, plaintiff left for his car and went home. In the next week, however, plaintiff began to experience numbness in his right hand and pain in his right arm. Although plaintiff was able to teach that week, he never returned after that to his teaching job at CCCA. Plaintiff subsequently underwent two different surgeries to help alleviate health problems that occurred after his fall, including pain, numbness, and bladder-control problems.

By his complaint filed November 6, 1996, and his second amended complaint, plaintiff brought a variety of claims arising from his employment at CCCA and his fall on the steps of the CCCA building. Plaintiff named as defendants the city of Columbus, CCCA, Myron Miller, and Anthem Blue Cross & Blue Shield. Against the city of Columbus, plaintiff asserted claims of (1) handicap discrimination pursuant to R.C. 4112.02(G), (2) employer intentional tort, (3) breach of contract, and (4) violation of public policy. Against Miller, plaintiff alleged claims of (1) handicap discrimination pursuant to R.C. 4112.02(G), (2) negligence, (3) intentional tort, and (4) violation of public policy. Finally, against CCCA, plaintiff alleged claims of (1) handicap discrimination pursuant to R.C. 4112.99, (2) employer intentional tort, and (3) violation of public policy. Plaintiff sought damages for pain and suffering, loss of enjoyment of life, emotional distress,

hospital and medical expenses, both past and future, lost earnings, both past and future, and punitive damages.

In their answers to plaintiff's second amended complaint, the city and CCCA each made claims against all other defendants for indemnification and contribution; Miller made such a claim only against CCCA. CCCA also asserted counterclaims against plaintiff, alleging that plaintiff had breached a duty of loyalty to CCCA and had conspired with others to trespass on CCCA's property. Subsequently, all defendants moved for summary judgment on all of plaintiff's claims. After briefing, the trial court issued a decision on August 4, 1998, finding that questions of fact precluded summary judgment for CCCA or Miller, but granting summary judgment for the city.

Plaintiff's case against CCCA and Miller went to trial on August 17, 1998. After plaintiff had rested his case, both defendants moved pursuant to Civ.R. 50 for directed verdicts on all of plaintiff's claims. The trial court granted Miller's motion and dismissed him from the case. Although the trial court granted a directed verdict on plaintiff's claims against CCCA for employer intentional tort, violation of public policy, and breach of contract, the trial court refused CCCA's motion on plaintiff's claim of handicap discrimination. After CCCA had presented its defense, it voluntarily dismissed its claims of trespass and conspiracy. The trial court then granted plaintiff's motion for a directed verdict on CCCA's remaining claim for breach of a duty of loyalty.

On August 27, 1998, the jury returned a verdict of $550,000 for plaintiff and against CCCA on plaintiff's handicap discrimination claim. Before the trial court had journalized the jury's verdict, CCCA filed a motion for a new trial pursuant to Civ.R. 59 or, in the alternative, a motion for judgment notwithstanding the verdict, pursuant to Civ.R. 50(B). On January 12, 1999, the trial court granted CCCA's motion for a new trial, finding "no correlation between the very large verdict awarded to plaintiff and the evidence presented regarding damages."

Plaintiff appeals, assigning the following errors:

"I. The trial court abused its discretion in granting a new trial when it held that the judgment was not supported by the weight of the evidence.

"II. The trial court abused its discretion in granting a new trial when it held that the verdict was based upon passion and prejudice.

"III. The trial court erred in refusing to instruct the jury on punitive damages.

"IV. The trial court erred in granting a directed verdict to defendant–appellee Miller, the owner of the building in which plaintiff worked and was injured, where the building was a 'place of public accommodation' and was not wheelchair accessible, in violation of ORC § 4112.

"V. The trial court erred in granting a directed verdict in favor of defendant–appellee Miller where a landlord has a duty to make his building safe for his tenants and his tenants' employees including a duty to make his building wheelchair accessible.

"VI. The trial court erred in excluding testimony of defendant–appellee Miller since such testimony constituted an admission of a party–opponent under Evid.R. 801(D) and was testimony of a lay witness based upon personal knowledge and the witness's own perceptions.

"VII. The trial court erred in holding that the city of Columbus did not 'act directly or indirectly in the interest' of defendant Community 21, as an employer, by discriminating against the plaintiff because of his disability when it failed to provide him a wheelchair accessible workplace in violation of ORC § 4112.99.

"VIII. The trial court erred in holding that the city of Columbus did not have a duty to provide the plaintiff with a wheelchair accessible workplace or building, in a public place of public accommodation in violation of ORC § 4112.02(G).

"IX. The trial court erred when it dismissed plaintiff's claim that he was a third-party beneficiary to the contract between the city of Columbus and Community 21.

"X. The trial court erred in dismissing the public policy argument that the three defendants violated ohio public policy when they failed to provide a wheelchair accessible workplace and building for the city's public access program, which resulted in the bodily injury of Berge and his constructive discharge.

"XI. The trial court erred when it dismissed the intentional tort against the defendants because they were aware of a dangerous condition which would cause harm to a substantial certainty and permitted the dangerous condition to exist."

CCCA cross-appeals, assigning the following errors:

"I. The trial court erred in failing to grant CCCA's motions for summary judgment and motions for directed verdict on appellant's handicap discrimination claim, front pay claim, and any unpleaded negligence claim.

"II. The trial court erred by failing to state which jury instructions it intended to give.

"III. The trial court erred by not allowing objections to jury instructions in open court.

"IV. The trial court erred by not giving CCCA's requested jury instruction on mitigation of damages.

"V. The trial court erred by giving over objection appellant's personal injury and future damages jury instructions.

"VI. The trial court erred by failing to allow CCCA to submit any damage interrogatories whatsoever.

"VII. The trial court erred by dismissing CCCA's breach of duty of loyalty claim against appellant on his motion for directed verdict."

## A. CLAIMS AGAINST THE CITY OF COLUMBUS

We first address plaintiff's assignments of error as they relate to the city of Columbus. In dismissing the city as a defendant, the trial court found that CCCA was an independent contractor of the city and, pursuant to the contract entered into between the city and CCCA, that the city was to be held harmless for any injuries arising out of the relationship. Because the trial court found that the city was not liable pursuant to contract for any of plaintiff's injuries, and the other defendants were not entitled to indemnification or contribution from the city, the court granted summary judgment on all claims against the city.

In accordance with Civ.R. 56, the evidence must be construed most strongly in favor of the nonmoving party; summary judgment should be granted only if no genuine issue of fact exists, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to but one conclusion, which is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. A motion for summary judgment first forces the moving party to inform the court of the basis of the motion and to identify portions in the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 296, 662 N.E.2d 264, 275–276. If the moving party makes that showing, the nonmoving party then must produce evidence on any issue for which the nonmoving party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus (*Celotex v. Catrett* [1986], 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, approved and followed).

### 1. HANDICAP–DISCRIMINATION CLAIM–R.C. 4112.02(A)

■ In his seventh assignment of error, plaintiff argues that the trial court erred in finding under plaintiff's handicap-discrimination claim that the city was not plaintiff's "employer," as that word is defined in R.C. 4112.01(A)(2).

Pursuant to R.C. 4112.02(A), it is unlawful for any employer, "because of the * * * handicap * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." "Employer" includes "the state, any political subdivision of the state, any person employing four or more persons within the state, and any person acting directly or indirectly in the interest of an employer." R.C.

4112.01(A)(2). "Person" is further defined as "one or more individuals, partnerships, associations, organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and other organized groups of persons. 'Person' also includes, but is not limited to, any owner, lessor, assignor, builder, manager, broker, salesman, appraiser, agent, employee, lending institution, and the state and all political subdivisions, authorities, agencies, boards, and commissions of the state." R.C. 4112.01(A)(1).

Plaintiff contends that an issue of fact remains in determining whether the city acted either directly or indirectly in the interest of CCCA so as to be an employer for the purposes of R.C. Chapter 4112. Plaintiff essentially asserts that because the city gave CCCA a significant percentage of its operating income, derived from the cable fund, the city was an "employer" as that term is defined in R.C. 4112.01(A)(2).

In attempting to define an "employer" under R.C. 4112.02, the court in *Wille v. Hunkar Laboratories, Inc.* (1998), 132 Ohio App.3d 92, 724 N.E.2d 492, inquired into the extent of a person's authority and power to employ, retain, and dismiss an employee. See, also, *Hart v. Justarr Corp.* (1994), 98 Ohio App.3d 673, 677, 649 N.E.2d 316, 318, and *King v. Owens–Corning Fiberglas Corp.* (Sept. 27, 1990), Franklin App. No. 90AP–200, unreported, 1990 WL 140561, citing *Foran v. Fisher Foods, Inc.* (1985), 17 Ohio St.3d 193, 194, 478 N.E.2d 998, 999–1000 (noting that "Ohio Supreme Court decisions have affirmed that the question to answer when identifying the employer is to identify who exercises day-to-day control over the employee").

Plaintiff has not shown that the city had such control over CCCA's employees. In fact, other than giving CCCA most of its operating income, the city had almost no contact with CCCA. CCCA was not a department or division of the city, and the city had no right to supervise CCCA's employees or regulate its hours of operation. The city does not own or operate CCCA, CCCA can spend the funding it receives from the city in its own discretion, and the city did not require CCCA to stay at the building it occupies. CCCA's simple receipt of a significant amount of money for its operation from the city does not turn the city into the employer of CCCA's employees, nor does it mean that the city was acting directly or indirectly in the interest of CCCA.

Further, plaintiff did not present any evidence to show that he ever made any payments to the Public Employees Retirement System ("PERS"), a requirement for public employees unless waived by a written application for exemption. No evidence was admitted to show that plaintiff had filed such a waiver. R.C. 145.03; *Lancaster v. Public Employees Retirement Sys. of Ohio* (1987), 40 Ohio App.3d 135, 137, 532 N.E.2d 144, 146–147. Plaintiff's failing to contribute to PERS provides further evidence that plaintiff was not a public employee and therefore

not an employee of the city. See *Wood v. Dorcas* (1998), 126 Ohio App.3d 730, 735, 711 N.E.2d 291, 294 (supporting conclusion that city was not an employer under R.C. 4113.51 where the worker was not paid by the city, did not receive any health benefits offered to city employees, was hired in a private capacity to perform services for the city on a contractual basis, and had not contributed to PERS).

Plaintiff next alleges that CCCA was an agent of the city, making the city an employer under R.C. 4112.01(A)(2). The trial court, however, found that CCCA was an independent contractor. Plaintiff contends that the distinction is not critical, contending that an "independent contractor" could be a "person" and thus an "employer." Contrary to plaintiff's contention, although "agent" is included in the definition of "person," "independent contractor" is not. R.C. 4112.01(A)(1). A distinction thus exists under the statute between an agent and an independent contractor.

The distinction between an agent and an independent contractor is found in Restatement of the Law 2d, Agency (1958) 7, Section 1, which provides that an agency relationship "is the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." See *Hensley v. New Albany Co.* (Dec. 31, 1997), Franklin App. No. 97APE02–189, unreported, 1997 WL 798776. An agent may also be an independent contractor, but an independent contractor need not be an agent. Restatement, *supra*, at 80, Section 14(n), Comment *b*. Independent-contractor status is determined by the right to control. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 524 N.E.2d 881, paragraph one of the syllabus; *Gillum v. Indus. Comm.* (1943), 141 Ohio St. 373, 25 O.O. 531, 48 N.E.2d 234, paragraph two of the syllabus; *Koch v. Conrad* (Dec. 9, 1997), Franklin App. No. 97APE05–663, unreported, 1997 WL 770985. The analysis inquires whether the employer retained control of, or the right to control, the mode and manner of doing the work contracted for. If so, the relationship is that of principal and agent or master and servant. If the employer did not retain control but is interested merely in the ultimate result to be accomplished, the relationship is that of independent contractor. *Councell v. Douglas* (1955), 163 Ohio St. 292, 56 O.O. 262, 126 N.E.2d 597, paragraph one of the syllabus. Factors to be considered include control over the details and quality of the work, the hours worked, selection of materials, tools, and personnel used, the routes traveled, the length of employment, the type of business, the method of payment, and any pertinent agreements or contracts. *Bostic, supra*, 37 Ohio St.3d at 146, 524 N.E.2d at 883–884.

■ Plaintiff's only evidence regarding the relationship between plaintiff and the city was the city's being the major source of CCCA's operating funds. Plaintiff presented no evidence that the city had control over the manner in which CCCA performed services or over its employees. Indeed, the contract between the city and CCCA specifically stated that CCCA's board of trustees "has ultimate fiscal, policy, and administrative responsibility for [CCCA's] programs and staff actions." CCCA was an independent contractor of the city, and that relationship does not render the city plaintiff's employer for purposes of R.C. 4112.02. Although plaintiff also relies on the phrase "acting directly or indirectly" found in the definition of employer under R.C. 4112.02, that language is simply to ensure that employers cannot escape *respondeat superior*, or agency, liability. *Genaro v. Cent. Trans., Inc.* (1999), 84 Ohio St.3d 293, 295, 703 N.E.2d 782, 784–785, citing *Czupih v. Card Pak, Inc.* (N.D.Ohio 1996), 916 F.Supp. 687, and *Gausmann v. Ashland* (N.D.Ohio 1996), 926 F.Supp. 635.

Because plaintiff presented no evidence to demonstrate an issue of material fact regarding the city as an employer, the trial court did not err in granting the city summary judgment on plaintiff's handicap-discrimination claim pursuant to R.C. 4112.02(A). Plaintiff's seventh assignment of error is overruled. .

2. HANDICAP–DISCRIMINATION CLAIM–R.C. 4112.02(G)

■ Plaintiff's eighth assignment of error contends that the trial court erred in dismissing his handicap-discrimination claim, referred to as a public-accommodation claim, against the city. Pursuant to R.C. 4112.02(G), it is illegal for "any proprietor or any employee, keeper, or manager of a place of public accommodation to deny to any person, except for reasons applicable alike to all persons regardless of * * * handicap * * * the full enjoyment of the accommodations, advantages, facilities, or privileges of the place of public accommodation." Plaintiff claims that the city was the proprietor, manager, or keeper of CCCA's building and thus is liable for denying plaintiff the full enjoyment of the premises, a place of public accommodation. The city responds that the trial court's decision was proper because the city was not the proprietor, manager, or keeper of a place of public accommodation and because CCCA was an independent contractor.

. Plaintiff failed to present any evidence demonstrating that the city was the proprietor, manager, or keeper of CCCA's building. The city's only relation to the building was that CCCA, an independent contractor of the city, operated a public access channel out of the building. The lease of the building was between Miller and CCCA; the city was not involved in any way. The city did not pay any of CCCA's rent, did not require CCCA to remain in the building, and did not manage or keep the building. The city simply paid CCCA to run a public access channel.

Because, as a matter of law, the city was not a proprietor, manager, or keeper of the building, the trial court did not err in granting summary judgment to the city. Plaintiff's eighth assignment of error is overruled.

3. BREACH–OF–CONTRACT CLAIM

Plaintiff's ninth assignment of error contends that the trial court erred in dismissing his breach-of-contract claim against the city. Plaintiff claims to be a third-party intended beneficiary of the city's contract with CCCA and contends that the city breached its obligations under the contract when it failed to provide a wheelchair-accessible entrance to the building.

 A third-party beneficiary is one for whose benefit a promise is made, but who is not a party to the contract encompassing the promise. *Chitlik v. Allstate Ins. Co.* (1973), 34 Ohio App.2d 193, 196, 63 O.O.2d 364, 366, 299 N.E.2d 295, 297. An intended beneficiary is one who has enforceable rights under the contract, in contrast to an incidental beneficiary, who has no rights of enforcement. *Hill v. Sonitrol of Southwestern Ohio* (1988), 36 Ohio St.3d 36, 40, 521 N.E.2d 780, 784–785. To have an intended beneficiary, the contract must be entered into with the intent to benefit that person. *Doe v. Adkins* (1996), 110 Ohio App.3d 427, 436, 674 N.E.2d 731, 736–737. If the city did not intend to benefit plaintiff, he is an incidental beneficiary with no enforceable rights under the contract. *Laverick v. Children's Hosp. Med. Ctr. of Akron* (1988), 43 Ohio App.3d 201, 540 N.E.2d 305. "[T]he mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract [is] insufficient; rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary." *Hill, supra,* 36 Ohio St.3d at 40, 521 N.E.2d at 785, quoting *Norfolk & W. Co. v. United States* (C.A.6, 1980), 641 F.2d 1201, 1208.

 Here plaintiff sued the city for breach of contract because the city failed to ensure that the building was wheelchair-accessible, despite Paragraph XIII of the contract expressly placing the duty of compliance with antidiscrimination laws on CCCA, not the city. Plaintiff nonetheless attempts to argue that the city breached its duty by not terminating the contract when it discovered that CCCA was not in compliance with the antidiscrimination laws. However, under Paragraph X of the contract, termination is a right that the city *may* exercise under certain conditions. The contract imposed no duty on the city to terminate the contract. Therefore, we need not address plaintiff's status as a third-party beneficiary. Instead, because the contract placed no duty on the city, the city cannot have breached its duty under the contract. The trial court properly dismissed plaintiff's breach-of-contract claim, and plaintiff's ninth assignment of error is overruled.

## B. CLAIMS AGAINST ALL DEFENDANTS

### 1. DISCHARGE IN VIOLATION OF PUBLIC POLICY

Plaintiff's tenth assignment of error contends that the trial court erred in dismissing his public-policy tort claim against the city on its summary judgment motion, and against CCCA and Miller on their motions for directed verdict.

Although the claim is inartfully articulated in plaintiff's complaint, plaintiff now alleges that the public-policy tort is actually a claim for wrongful discharge in violation of public policy. *Greeley v. Miami Valley Maintenance* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981. *Greeley* held that an employer's right to terminate employment of an at-will employee does not include "the discharge of an employee where the discharge is in violation of a statute and thereby contravenes public policy." *Id.* at paragraph two of the syllabus. Clear public policy not only can be found in the statutes that have been passed by the General Assembly, but also "may also be discerned as a matter of law based on other sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law." *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51, paragraph three of the syllabus.

 The elements of a *Greeley* claim are as follows:

1. A clear public policy existed and was manifested in a state or federal constitution, statute, or administrative regulation, or in the common law (the clarity element).

2. Dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).

4. The employer lacked overriding legitimate business justification for the dismissal (the overriding-justification element). *Id.*

 Under the third element of a *Greeley* claim, plaintiff must have been dismissed from his job. Plaintiff was never fired from CCCA. Plaintiff, however, claims that as a result of defendants' actions or inaction, he was constructively discharged from his position at CCCA. *See, e.g., Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 67, 652 N.E.2d 653, 656–657; *Chapman v. Adia Services, Inc.* (1997), 116 Ohio App.3d 534, 544, 688 N.E.2d 604, 610–611. An employee has been constructively discharged when the employer's actions make working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign. *Mauzy v. Kelly Services, Inc.* (1996), 75 Ohio St.3d 578, 664 N.E.2d 1272. Further, to show constructive discharge, an employee must demonstrate that "the cumulative effect of the employer's actions would make a

reasonable person believe that termination was imminent." *Id.* at 589, 664 N.E.2d at 1281.

▮ Even if we assume that plaintiff was constructively discharged, plaintiff's *Greeley* claim cannot be maintained against the city because the city was not plaintiff's employer. *Mauzy, supra.* While plaintiff seeks to extend *Greeley* to those who were not plaintiff's employer, plaintiff has pointed to no authority, nor have we found any support, for such an extension. The trial court did not err when it granted summary judgment to the city on plaintiff's *Greeley* claim.

In granting the directed verdict motions of CCCA and Miller, the trial court found that plaintiff's remedy against CCCA was in R.C. 4112.99, not in a common-law tort claim. As to Miller, the trial court granted the motion because Ohio's public policy does not mandate that all buildings be wheelchair-accessible.

A directed verdict should be granted if the movant is entitled to judgment as a matter of law when the evidence is construed most strongly in favor of the nonmovant. *Sanek v. Duracote Corp.* (1989), 43 Ohio St.3d 169, 172, 539 N.E.2d 1114, 1116–1117. Thus, the jury should consider plaintiff's *Greeley* claim only if probative evidence, if believed, would permit reasonable minds to come to different conclusions as to the essential issue of the case. *Id.* If substantial evidence exists in support of plaintiff's claim, the motion must be overruled. *Pariseau v. Wedge Products, Inc.* (1988), 36 Ohio St.3d 124, 127, 522 N.E.2d 511, 514–515

▮ Even construing the evidence most strongly in favor of plaintiff, no evidence shows that Miller was plaintiff's employer. He was simply the owner and landlord of the building in which CCCA operated its business; he had no authority whatsoever over the terms of plaintiff's employment with CCCA. Because a constructive discharge must result from the actions of an employer, the trial court properly dismissed plaintiff's *Greeley* claim against Miller.

▮ As to CCCA, no one contends that CCCA was not plaintiff's employer, and handicap discrimination clearly violates Ohio's public policy. R.C. 4112.02(A); *Collins, supra,* 73 Ohio St.3d at 72, 652 N.E.2d at 659–660. The trial court nonetheless dismissed plaintiff's *Greeley* claim, deciding as a matter of law that the claim could not be brought while plaintiff had a sufficient civil remedy available to him under R.C. 4112.99. As support for the trial court's rationale, CCCA notes that the cases creating and applying the *Greeley* claim sought to provide a remedy where none otherwise existed for an employee discharged for a reason contrary to statute or public policy.

In *Greeley,* the plaintiff was fired from his job after a withholding order was placed on his wages, pursuant to R.C. 3113.21(D). R.C. 3113.213(D) specifically made it unlawful for an employer to use an order of withholding as a basis to

terminate an employee, but it provided only for a fine against the employer, not a civil remedy for the terminated employee. *Greeley* recognized a tort claim for the plaintiff in that instance, observing that the General Assembly could not have intended to foreclose a civil remedy for violations of the statute, for that would frustrate the policy underlying the statute.

In *Provens v. Stark Cty. Bd. of Mental Retardation & Developmental Disabilities* (1992), 64 Ohio St.3d 252, 594 N.E.2d 959, the court qualified *Greeley*, holding that "public employees do not have a private cause of civil action against their employer to redress alleged violations by their employer of policies embodied in the Ohio Constitution when it is determined that there are other reasonably satisfactory remedies provided by statutory enactment and administrative process." *Id.* at 261, 594 N.E.2d at 964. *Provens* specifically found that the remedies under R.C. Chapter 4112 provide meaningful relief. *Id.* at 258, 594 N.E.2d at 963–964. See, also, *Schwartz v. Comcorp, Inc.* (1993), 91 Ohio App.3d 639, 648, 633 N.E.2d 551, 557 (noting that a *Greeley* claim could not apply where the statute declaring the public policy that had been violated "contains within its provisions a specific legal remedy for its violation"); *Anderson v. Lorain Cty. Title Co.* (1993), 88 Ohio App.3d 367, 373, 623 N.E.2d 1318, 1322 (declining to allow claim for wrongful discharge in violation of R.C. 4123.90 when statute itself provides an effective remedy).

The Ohio Supreme Court readdressed the *Greeley* claim in *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 677 N.E.2d 308. In a case involving R.C. 4113.52, the whistleblower statute, the court decided that "[t]he remedies available pursuant to R.C. 4113.52 for violations of the statute and the remedies available for the tort of wrongful discharge are cumulative." *Id.* at paragraph four of the syllabus. The court noted that the *Greeley* decision creating a wrongful discharge tort "was not intended to apply only where a statute provides no civil remedies." *Id.* at 155, 677 N.E.2d at 324. Nonetheless, after reviewing previous cases that seemed to allow both a statutory claim and a common-law claim, *Kulch* stated:

"The remedies available pursuant to R.C. 4113.52 are not sufficient to provide the complete relief that would otherwise be available in a *Greeley*-based cause of action for the tort of wrongful discharge. The statute does not provide for certain compensatory damages and does not specifically authorize recovery of punitive damages. * * * Clearly, the relief available to a whistleblower under a statutory cause of action comes nowhere near the complete relief available in an action based upon the *Greeley* public-policy exception to the doctrine of employment at will. * * * Thus, we find that the mere existence of statutory remedies for violations of R.C. 4113.52 does not operate as a bar to alternative common-law

remedies for wrongful discharge in violation of the public policy embodied in the Whistleblower Statute." *Id.* at 157, 677 N.E.2d at 325.

See, also, *Wallace v. Trumbull Mem. Hosp.* (1997), 970 F.Supp. 618, 621 (citing *Kulch* for the proposition that "the mere existence of statutory remedies does not without more, operate to bar a claim for wrongful discharge *unless the remedies available under the statute are sufficient to provide the complete relief that would otherwise be available in a common law cause of action for wrongful discharge* " [emphasis added] ).

Unlike the more limited remedies available under R.C. 4113.52, R.C. 4112.99 provides that in a claim for handicap discrimination, an employee may bring "a civil action for damages, injunctive relief, or any other appropriate relief." Cf. *Helmick v. Cincinnati Word Processing, Inc.* (1989), 45 Ohio St.3d 131, 134, 543 N.E.2d 1212, 1215 (holding that to allow "a plaintiff to pursue common-law remedies in lieu of the relief provided under R.C. Chapter 4112 creates no conflict and serves to supplement the limited protection and coverage of that chapter," which, when *Helmick* was decided, provided limited relief, such as injunctive relief, reinstatement, and back pay).

The remedies available to a plaintiff in claiming employment discrimination are much broader now than the limited remedies set forth in former R.C. 4112.05(G) and *Helmick.* See *Rice v. CertainTeed Corp.* (1999), 84 Ohio St.3d 417, 419, 704 N.E.2d 1217, 1219 (finding that the term "damages" in R.C. 4112.99 is "an inclusive term embracing the panoply of legally recognized pecuniary relief" such as compensatory and punitive damages); *Provens, supra.* As a result, the concerns in *Kulch* and *Helmick* that justified allowing a *Greeley* claim in addition to claims under R.C. Chapter 4112 are not present here. Plaintiff's remedies under R.C. 4112.99 are sufficient to provide the complete relief required by *Kulch.* The trial court did not err in dismissing plaintiff's claim of wrongful discharge in violation of public policy against CCCA. Plaintiff's tenth assignment of error is overruled.

## 2. INTENTIONAL–TORT CLAIMS

Plaintiff's eleventh assignment of error contends the trial court erred when it granted summary judgment to the city on plaintiff's claim of intentional employment tort and dismissed Miller and CCCA on their motions for directed verdict on the same claim. Because neither the city nor Miller was plaintiff's employer, the trial court properly dismissed plaintiff's employer intentional-tort claim against them. CCCA, however, was plaintiff's employer and thus a potential defendant in a claim for an employer intentional tort.

"[I]n order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the

following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. (*Van Fossen v. Babcock & Wilcox Co.* [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus, modified as set forth above and explained.)" *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, 1109, paragraph one of the syllabus.

For purposes of his claim of an employer intentional tort, plaintiff claims that he was subjected to a dangerous condition in being bumped up and down the stairs with his wheelchair to enter and exit the building. CCCA contends that it did not know that plaintiff was going up the front steps to enter the building because it had agreed with plaintiff that he would go through the side door near the stage. The trial court dismissed plaintiff's claim against CCCA because plaintiff failed to present sufficient evidence (1) to establish a dangerous process or instrumentality or (2) to show that CCCA knew with substantial certainty that harm would result from any alleged dangerous process, but nonetheless required plaintiff to perform the dangerous process.

Plaintiff presented evidence that CCCA had knowledge of a dangerous process or condition. Heidi Mau, the former executive director, gave plaintiff a buzzer, and knew he was using it, to alert other employees that he had arrived and to request assistance up the stairs. Similarly, Patricia Williamson, then interim executive director, testified that she knew that plaintiff was being carried up and down the front steps to get into the building. Indeed, plaintiff told the executive director of CCCA, Laurie Cirivello, that the situation was dangerous.

▆▆▆▆ To satisfy the second prong of the *Fyffe* test, plaintiff had to produce evidence that CCCA knew of the substantial certainty of injury to plaintiff as a result of the dangerous condition. "[E]ven if an injury is foreseeable, and even if it is probable that the injury would occur if one were exposed to the danger enough times, 'there is a difference between probability and substantial certainty.'" *Heard v. United Parcel Serv.* (July 20, 1999), Franklin App. No. 98AP–1267, unreported, 1999 WL 814391, quoting *Ruby v. Ohio Dept. of Natural Resources* (Dec. 3, 1992), Franklin App. No. 92AP–947, unreported, 1992 WL 361817. "[T]he mere knowledge and appreciation of a risk–something short of substantial certainty–is not intent." *Fyffe, supra,* at paragraph two of the syllabus. Unless the employer actually intends to produce the harmful result or knows that injury to its employee is certain or substantially certain to result from the dangerous instrumentality or condition, the employer cannot be held liable.

*Id.* Accordingly, an intentional-tort action against an employer is not shown simply because a known risk later blossoms into reality. *Van Fossen, supra,* 36 Ohio St.3d at 116, 522 N.E.2d at 503. Rather, "the level of risk-exposure [must be] so egregious as to constitute an intentional wrong." *Sanek v. Duracote Corp.* (1989), 43 Ohio St.3d 169, 172, 539 N.E.2d 1114, 1117.

 Plaintiff did not present any evidence to demonstrate knowledge on CCCA's part that injury was substantially certain to occur as a result of his being lifted up and down the front stairs at CCCA. Although prior accidents resulting from the hazard are probative of whether an employer knows that an injury is substantially certain to occur, *Foust v. Magnum Restaurants, Inc.* (1994), 97 Ohio App.3d 451, 646 N.E.2d 1150, plaintiff presented no such evidence. Plaintiff's having worked at CCCA for three years without injury while being lifted up and down the stairs is evidence to the contrary.

Indeed, plaintiff's most probative evidence on the substantial-certainty element of *Fyffe* was testimony of an employee about staff meeting discussions concerning plaintiff's safety in being lifted up and down the stairs. Even when viewed in the light most favorable to plaintiff, plaintiff's evidence does not support a finding that CCCA knew with substantial certainty that injury would occur to plaintiff, though it may indicate negligence or even recklessness. Because plaintiff failed to present sufficient evidence under the second prong of *Fyffe,* the trial court did not err in dismissing plaintiff's employer intentional-tort claim against CCCA. Plaintiff's eleventh assignment of error is overruled.

## C. CLAIMS AGAINST MILLER

Plaintiff's next three assignments of error relate to Miller, the landlord of the building in which CCCA was housed. Plaintiff's sixth assignment of error contends that the trial court erred in excluding a portion of Miller's testimony. Specifically, in his deposition that was read to the jury, Miller was asked: "Based on what you witnessed, would it be your opinion that someone in a wheelchair could place themself [*sic*] in jeopardy by going up and down those stairs?" Miller's attorney objected to the question, and the trial court, sustaining the objection, struck the question and answer because any observation would not have been based on Miller's own personal knowledge. The trial court felt that because Miller had not seen how any handicapped persons entered the building, he would have no personal knowledge with which to answer the question.

 Appellate reviews of the admission or exclusion of evidence generally is limited to whether the lower court abused its discretion. *State v. Finnerty* (1989), 45 Ohio St.3d 104, 543 N.E.2d 1233. "Abuse of discretion" implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140.

Evid.R. 602 states that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself." Miller initially stated in his deposition that he had seen people in wheelchairs in his building but that he had never seen how they entered the building. He later stated that he had seen people in wheelchairs being carried down the front steps maybe three times. Miller thus possessed the requisite personal knowledge to answer plaintiff's question.

However, the excluded question asked Miller for an opinion. A lay witness, such as Miller, may testify in the form of an opinion if that opinion is (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. Evid.R. 701; *State v. Berry* (June 23, 1988), Franklin App. No. 87AP–924, unreported, 1988 WL 66753. Given Miller's testimony, his opinion would be rationally based on his own perception. The issue thus resolves to whether Miller's answer would be helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

■■■ Miller's positive response to the question may have been helpful to determining whether plaintiff was exposed to a dangerous process or condition under plaintiff's intentional-tort claim. While the trial court arguably should have allowed the testimony, plaintiff sustained no prejudice because his claims of employer intentional tort all were properly rejected for other reasons. Accordingly, plaintiff's sixth assignment of error is overruled.

1. HANDICAP–DISCRIMINATION CLAIM–R.C. 4112.02(G)

Plaintiff's fourth assignment of error contends that the trial court erred when it granted a directed verdict in favor of Miller on plaintiff's claim of handicap discrimination, referred to as a public-accommodation claim under R.C. 4112.02(G). The trial court decided that Miller had no intent to discriminate against plaintiff and that no statutory or case law required Miller to make his building wheelchair-accessible.

R.C. 4112.02(G) applies to places of public accommodation. Miller contends that his building was not a place of public accommodation and, even if it was, that he was exempted from any requirement to conform to R.C. 4112.02 by a grandfather provision in Ohio Adm.Code 4112–5–06(E) and (F). Plaintiff argues that the building is a place of public accommodation, since it is leased to a public access television station that is funded by the city and CCCA's services are available to the public.

■■■ A place of public accommodation is defined as "any inn, restaurant, eating house, barbershop, public conveyance by air, land, or water, theater, store,

other place for the sale of merchandise, or any other place of public accommodation or amusement of which the accommodations, advantages, facilities, or privileges are available to the public." R.C. 4112.01(A)(9); see, also, Ohio Adm.Code 4112–5–02(I). R.C. 4112.01 and 4112.02 are remedial statutes and should be interpreted liberally to effectuate their purpose and to ensure that the rights granted by the statutes are not defeated by overly restrictive interpretation. *Ohio Civ. Rights Comm. v. Lysyj* (1974), 38 Ohio St.2d 217, 220, 67 O.O.2d 287, 289, 313 N.E.2d 3, 6. Finding a trailer park to be a place of public accommodation, *Lysyj* noted that "[t]he establishments specifically delineated in [former] R.C. 4112.01(I) [defining public accommodation] all display several features of distinguishing similarity that indicate the intended scope of the omnibus clause. Each place offers accommodations, advantages, facilities or privileges to a substantial public. Secondly, each place offers its accommodations to the public on a nonsocial, sporadic, impersonal and nongratuitous basis." *Id.* at 220, 67 O.O.2d at 289, 313 N.E.2d at 6. See, also, *Little Forest Med. Ctr. of Akron v. Ohio Civ. Rights Comm.* (1991), 61 Ohio St.3d 607, 609–610, 575 N.E.2d 1164, 1167–1168, and *Wooten v. Columbus Div. of Water* (1993), 91 Ohio App.3d 326, 334, 632 N.E.2d 605, 610 (noting the usefulness of federal statutes, and case law interpreting them, in interpreting R.C. Chapter 4112).

The Ohio Supreme Court's interpretation of "public accommodation" in *Lysyj* and the federal statutes, including the Americans with Disabilities Act ("ADA"), Section 12101 *et seq.*, Section 2000a, Title 42, U.S.Code, compel the conclusion that the building was a place of public accommodation. CCCA offered its services, facilities, or privileges to the public, and allowed the public to come in and take classes to learn to produce television shows for a public access channel. Although CCCA argues that the payment of fees by members of the public before they can use CCCA's equipment means CCCA's services are not available to the general public, CCCA's argument is not well taken. Many of the public accommodations listed in R.C. 4112.01(A)(9), such as restaurants and theaters, charge a fee for the services that they provide.

Nonetheless, in order to prevail on an employment-discrimination claim under R.C. Chapter 4112, plaintiff must prove discriminatory intent. *Mauzy v. Kelly Services, Inc.* (1996), 75 Ohio St.3d 578, 583, 664 N.E.2d 1272, 1276–1277; see, also, *Fiske v. Rooney* (1995), 105 Ohio App.3d 269, 276, 663 N.E.2d 1014, 1018 (finding that a question of fact existed as to discriminatory intent in public-accommodation claim pursuant to R.C. 4112.02[G] ). Discriminatory intent may be proven either directly or indirectly. *Byrnes v. LCI Communication Holdings Co.* (1996), 77 Ohio St.3d 125, 127, 672 N.E.2d 145, 147. Plaintiff attempted to prove discriminatory intent directly, not indirectly. Under the direct method, "a plaintiff may establish a * * * case of * * * discrimination * * * by presenting

evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent." *Mauzy, supra,* paragraph one of the syllabus. A plaintiff pursuing a claim under the direct method must establish a causal link or nexus between the discriminatory statements or conduct and the prohibited act of discrimination. *Id.,* at 129, 672 N.E.2d at 148.

■ Plaintiff contends that Miller's testimony provides sufficient evidence of intent to defeat Miller's motion for directed verdict. According to Miller's testimony, he received a letter written by Laurie Cirivello, then executive director of CCCA, telling Miller the building was not wheelchair-accessible. Further, a meeting was held at CCCA before plaintiff started his teaching position, at which plaintiff discussed possible changes to the building to make it wheelchair-accessible. According to plaintiff, Miller attended that meeting and plaintiff was introduced to the people there as a potential employee. Miller stated that CCCA employees might have told him that lifting wheelchair-bound people up the front stairs of his building was dangerous.

Even if all the evidence is construed in a light most favorable to plaintiff, the trial court did not err in directing a verdict in favor of Miller, as plaintiff presented no evidence that Miller knew that plaintiff was working at the building. To the contrary, Miller himself testified that he did not know that plaintiff worked at the building. Although Miller stopped working at the building in 1994, even when he worked there he never stayed past 5:00 p.m.; plaintiff came to work at CCCA at 6:30 p.m. Plaintiff presented insufficient evidence for reasonable minds to come to any conclusion other than that Miller did not know that plaintiff was working at the building and therefore could not have intended to discriminate against him. Plaintiff's fourth assignment of error is overruled.

## 2. NEGLIGENCE CLAIM

■ Plaintiff's fifth assignment of error contends that the trial court erred in dismissing his negligence claim against Miller. To establish Miller's negligence, plaintiff must show the existence of a duty Miller owed to plaintiff, a breach of that duty, and an injury proximately resulting from that breach. *Menifee v. Ohio Welding Products* (1984), 15 Ohio St.3d 75, 77, 15 OBR 179, 180–181, 472 N.E.2d 707, 710.

■ Plaintiff contends that under R.C. 5321.04, Miller had a duty to comply with all building codes and to keep common areas in a safe condition and that Miller's violation of the statute is negligence *per se.* "Where there exists a legislative enactment commanding or prohibiting for the safety of others the doing of a specific act and there is a violation of such enactment solely by one whose duty it is to obey it, such violation constitutes negligence per se." *Eisenhuth v. Moneyhon* (1954), 161 Ohio St. 367, 53 O.O. 274, 119 N.E.2d 440.

R.C. Chapter 5321, however, applies only to residential property, defined as "a dwelling unit for residential use and occupancy." R.C. 5321.01(C). The duties R.C. Chapter 5321 impose on landlords do not apply to commercial premises and therefore do not impose any duty on Miller, a landlord of a commercial property. *Knickerbocker Bldg. Services, Inc. v. Phillips* (1984), 20 Ohio App.3d 158, 20 O.B.R. 192, 485 N.E.2d 260.

 Plaintiff next contends that Miller was negligent *per se* in violating Ohio Adm.Code 4101:2–2–03 and 4112–5–06. Only violations of a specific legislative enactment may support a finding of negligence *per se*. *Swart v. Ohio Dept. of Rehab. & Corr.* (1999), 133 Ohio App.3d 420, 728 N.E.2d 428 (disregarding plaintiff's claim that a violation of an Ohio Adm.Code section could constitute negligence *per se*), citing *Chambers v. St. Mary's School* (1998), 82 Ohio St.3d 563, 568, 697 N.E.2d 198, 202–203; *Jaworowski v. Med. Radiation Consultants* (1991), 71 Ohio App.3d 320, 594 N.E.2d 9. Plaintiff's contention thus is not persuasive.

Plaintiff further contends that Miller was negligent *per se* in violating regulations under the Occupational Safety and Health Act ("OSHA"), Section 651 *et seq.*, Title 29, U.S.Code by not making his building wheelchair-accessible. Again, his contention is not well taken. See *Hernandez v. Martin Chevrolet, Inc.* (1995), 72 Ohio St.3d 302, 649 N.E.2d 1215 (holding that violation of an OSHA regulation does not constitute negligence *per se* because OSHA regulations are not intended to affect the duties owed for the safety and protection of others).

 Plaintiff finally asserts that Miller's failure to comply with the ADA, Section 12101 *et seq.*, Title 42, U.S.Code, was negligence *per se*. A claim for negligence *per se* may be had only when a statute sets forth a *specific course of conduct* designed to protect the safety of others. *Westervelt v. Rooker* (1983), 4 Ohio St.3d 146, 4 OBR 390, 447 N.E.2d 1307. "However, where the duty is defined 'only in abstract or general terms, leaving to the jury the ascertainment and determination of reasonableness and correctness of acts and conduct under the proven conditions and circumstances, the phrase negligence *per se* has no application.' *Swoboda v. Brown* (1935), 129 Ohio St. 512, 523, 2 O.O. 516, 521, 196 N.E. 274, 279. In *Eisenhuth* we further explained that where the duty prescribed by the enactment is so specific that the only determination necessary by the jury is to find but a single fact, a violation of the statute, then there is negligence *per se*. Conversely, if the jury must determine negligence from a consideration of several facts and circumstances, then negligence *per se* is inapplicable." *Hurst v. Ohio Dept. of Rehab. & Corr.* (1995), 72 Ohio St.3d 325, 327, 650 N.E.2d 104, 106.

■ The duties imposed by the ADA are abstract duties. Plaintiff can cite no specific duty, and so he notes instead the requirement that Miller remove barriers to the disabled where the removal is readily achievable. Section 12182(b)(2)(A)(iv), Title 42, U.S.Code. Such an abstract and general duty would require the jury to determine what is "readily achievable" from a consideration of several facts and circumstances. Negligence *per se* is inapplicable in such a case. *Eisenhuth, supra,* 161 Ohio St. at 374, 53 O.O. 274, 277–278, 119 N.E.2d at 444; see, also, *Becker v. Shaull* (1992), 62 Ohio St.3d 480, 483, 584 N.E.2d 684, 686 (finding no negligence *per se* when alleged violated statute, R.C. 5589.06, lacked the specificity required to impose negligence *per se* upon the finding of a violation).

Accordingly, the trial court properly dismissed plaintiff's negligence claim against Miller. Plaintiff's fifth assignment of error is overruled.

### D. PUNITIVE DAMAGES

■ Plaintiff's third assignment of error contends that the trial court erred in failing to instruct the jury on punitive damages. Punitive damages may be awarded in actions brought pursuant to R.C. 4112.99. *Rice, supra.* Although plaintiff requested a jury instruction and interrogatory on punitive damages, the trial court did not give the requested instruction or interrogatory, and plaintiff did not object to the trial court's omission.

Civ.R. 51(A) provides that "[o]n appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Thus, the "fundamental rule is that an appellate court will not consider any error which could have been brought to the trial court's attention, and hence avoided or otherwise corrected." *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 210, 24 O.O.3d 316, 317–318, 436 N.E.2d 1001, 1003.

Even if no formal objection is made to the trial court's omission of a jury instruction, such a failure may be excused by an exception to the waiver rule found in *Presley v. Norwood* (1973), 36 Ohio St.2d 29, 65 O.O.2d 129, 303 N.E.2d 81. In *Presley,* the Ohio Supreme Court held that "[w]here the record affirmatively shows that a trial court has been fully apprised of the correct law governing a material issue in dispute, and that the complaining party has unsuccessfully requested the inclusion of that law in the trial court's charge to the jury, such party does not waive his objections to the court's charge by failing to *formally* object thereto." (Emphasis *sic.*) *Id.* at paragraph one of the syllabus. Once a party makes a position clear enough to the trial court to give the court an opportunity to correct a mistake or defect in the charge, the rationale for a

formal objection as required by Civ.R. 51(A) is no longer present. *Id.* at 33, 65 O.O.2d at 131, 303 N.E.2d at 84–85; see, also, *State v. Wolons* (1989), 44 Ohio St.3d 64, 67, 541 N.E.2d 443, 445–446; *Duboe v. Accurate Fabrication* (July 20, 1999), Franklin App. No. 98AP–842, unreported. In such a case, an objection would be a mere formality. *Id.*

Nonetheless, the *Presley* exception does not apply each time the trial court fails to give an instruction included among a party's proposed instructions. *Duboe, supra;* but, see, *Daratony v. Paul Revere Life Ins. Co.* (Mar. 30, 1995), Franklin App. No. 94APE05–727, unreported, 1995 WL 141194. Rather, *"Presley* is most appropriately applied when the appellant formally requested a particular instruction and the transcript of the trial reflects that the issue had been argued to the trial court during a conference or hearing on the jury instructions." *Duboe, supra,* at 8, citing *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 61, 567 N.E.2d 1291, 1295 (finding no waiver when "trial court and counsel for the parties engaged in lengthy discussion regarding the proposed instructions at issue, making their positions clear to the trial court"); *Wolons, supra,* 44 Ohio St.3d at 67, 541 N.E.2d at 445–446 (applying the *Presley* exception in criminal case and finding no waiver where counsel and trial court had an "extensive discussion" regarding a proposed jury instruction). See, also, *Fulwiler v. Schneider* (1995), 104 Ohio App.3d 398, 407–408, 662 N.E.2d 82, 87–88; *United States Fidelity & Guaranty Co. v. Inter–City Products Corp.* (Aug. 14, 1998), Columbiana App. No. 95–CO–75, unreported, 1998 WL 549068.

█ The trial court here held extensive, argumentative conferences to determine what jury instructions it would give. In none of the conferences did plaintiff's counsel mention the proposed instruction on punitive damages. At the end of the conferences, the trial court decided to prepare its own instructions, and it told counsel to object after the instructions. After reading the instructions to the jury, the trial court asked if either counsel had anything further they wanted to raise. Plaintiff's counsel stated, "Not at this time, Judge." After the jury left to deliberate, plaintiff's counsel objected to the language in two interrogatories, but neither interrogatory concerned punitive damages. The *Presley* exception thus does not apply. Failing to object to the trial court's exclusion of his requested instruction, plaintiff has waived all but plain error. *Schade, supra,* 70 Ohio St.2d at 209, 24 O.O.3d at 317, 436 N.E.2d at 1002–1003; *O'Connell v. Chesapeake & Ohio R.R. Co.* (1991), 58 Ohio St.3d 226, 229, 569 N.E.2d 889, 892.

"Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus. Although the plain-error doctrine is applied almost exclusively in criminal cases, the Ohio Supreme Court has applied it to civil cases

if the complaining party fails to object to the jury instruction and the error "would have a material adverse affect [*sic*] on the character and public confidence in judicial proceedings." *Schade, supra,* 70 Ohio St.2d at 209, 24 O.O.3d at 317, 436 N.E.2d at 1003; see, also, *Yungwirth v. McAvoy* (1972), 32 Ohio St.2d 285, 288, 61 O.O.2d 504, 505–506, 291 N.E.2d 739, 741–742.

■ Under Ohio law, an award of punitive damages is available only upon a finding of actual malice. *Sutherland v. Nationwide Gen. Ins. Co.* (1994), 96 Ohio App.3d 793, 810, 645 N.E.2d 1338, 1350, citing *Calmes v. Goodyear Tire & Rubber Co.* (1991), 61 Ohio St.3d 470, 473, 575 N.E.2d 416, 419. In *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, the Supreme Court of Ohio defined "actual malice" for purposes of an award of punitive damages as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis *sic*.) *Id.* at syllabus.

■ While plaintiff argues that years of unsatisfied requests for accommodations demonstrate actual malice, plaintiff testified that CCCA made some accommodations to allow him to work at CCCA; more major renovation would have required Miller's consent, and he did not give it. In addition, Laurie Cirivello made frequent requests to the city for more funding that would allow CCCA either to make the building more easily accessible or to move into a new facility. Moreover, when plaintiff complained of having to wait outside for an employee to help him into the building, CCCA set up a buzzer system so plaintiff could notify the employees that he was there. Plaintiff presented no evidence to show that CCCA acted with any hatred or ill will toward plaintiff or that it acted with a conscious disregard for plaintiff's safety, apart from that inherent in a handicap-discrimination claim. The trial court's failure to give an instruction on punitive damages did not rise to the level of plain error: even if the matter should have been presented for the jury's consideration, the evidence regarding malice was not so overwhelming as to suggest that the outcome would have been different or to reflect adversely on the character of or public confidence in judicial proceedings. *Schade, supra.* Plaintiff's third assignment of error is overruled.

E. CCCA'S MOTION FOR A NEW TRIAL

Plaintiff's first and second assignments of error both contend that the trial court erred in granting CCCA's motion for a new trial. The trial court granted CCCA's motion pursuant to Civ.R. 59(A)(4) and (6), finding no correlation "between the very large verdict awarded to plaintiff and the evidence presented regarding damages."

Civ.R. 59(A) provides:

"A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

" * * *

"(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;

" * * *

"(6) The judgment is not sustained by the weight of the evidence * * * [.]"

## 1. CIV. R. 59(A)(4)

 Although the trial court's decision is predicated largely on Civ.R. 59(A)(6) grounds, the decision also cites Civ.R. 59(A)(4). To support a finding of passion or prejudice under Civ.R. 59(A)(4), CCCA must demonstrate that "the jury's assessment of the damages was so overwhelmingly disproportionate as to shock reasonable sensibilities." *Pena v. Northeast Ohio Emergency Affiliates, Inc.* (1995), 108 Ohio App.3d 96, 104, 670 N.E.2d 268, 273–274. In assessing such a claim, a reviewing court should consider the amount of the verdict, whether the jury considered incompetent evidence, improper argument by counsel, or other improper conduct that can be said to have influenced the jury. *Dillon v. Bundy* (1991), 72 Ohio App.3d 767, 773, 596 N.E.2d 500, 504. The granting of a new trial because the verdict is so excessive as to be the result of passion or prejudice rests in the trial court's discretion. *Fields v. Dailey* (1990), 68 Ohio App.3d 33, 39, 587 N.E.2d 400, 403–404.

In support of its contention that the jury's award was motivated by passion or prejudice, CCCA submitted a juror's affidavit stating that he felt that the jury's award was based on sympathy, not the evidence. After plaintiff filed a motion to strike the affidavit, the juror filed a revised affidavit in which he explained that the sympathy he described in his previous affidavit was caused by plaintiff's crying in the courtroom. The juror also stated that plaintiff would move his wheelchair at the end of the day so the jurors would have to walk by him when they left the courtroom. According to the juror, plaintiff's actions caused the damage award to be influenced by passion or prejudice.

Patricia Williamson, a witness in the matter, also filed an affidavit recounting the same facts. She stated that she witnessed plaintiff crying in the courtroom and moving himself in the way of the jurors leaving the courtroom. According to Williamson, plaintiff often would have tears in his eyes as he attempted to get the jury's attention. She stated that plaintiff's actions had an obvious effect on the jury and that the damage award was based on passion or prejudice, not the evidence. In granting CCCA's motion for a new trial, the trial court decided that

plaintiff's motions to strike the juror's affidavit were rendered moot by the decision to grant a new trial.

Evid.R. 606(B) provides:

"Upon an inquiry into the validity of a verdict of indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. * * * His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes."

According to the Staff Notes of Evid.R. 606(B), "the rule conforms to Ohio's *Aliunde* Rule," which holds that "the verdict of a jury may not be impeached by the evidence of a member of the jury unless foundation for the introduction of such evidence is first laid by competent evidence * * * from some other source." *State v. Adams* (1943), 141 Ohio St. 423, 427, 25 O.O. 570, 572, 48 N.E.2d 861, 862–863; *Fares v. Scheussler* (Mar. 31, 1994), Franklin App. No. 93APE10–1373, unreported, 1994 WL 110716.

■ While evidence from some other source is necessary before a member of the jury can impeach its own verdict, no such evidence exists in the record. Williamson's affidavit apparently was submitted to conform to the aliunde rule, but it fails to do so because the other source must possess first-hand knowledge of the jury's allegedly improper conduct. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 75, 564 N.E.2d 54, 61. Williamson's affidavit does not demonstrate any first-hand knowledge of any improper jury conduct. Although she states that plaintiff's conduct had an "obvious effect upon the jury" and that "[i]t was obvious the jury verdict was based upon passion and prejudice," Willamson provides no basis whatsoever for her conclusions or for finding that she had any first-hand, personal knowledge of anything improper the jury considered, including first-hand knowledge of jury deliberations. Her affidavit thus does not constitute evidence aliunde. *Id.*

Without any such evidence, the trial court could not consider the juror's affidavit to determine whether the jury's award was the result of passion or prejudice. As a result, no competent evidence was before the trial court addressing the jury's allegedly improper motive in reaching its verdict. If the

trial court granted CCCA's motion pursuant to Civ.R. 59(A)(4), it abused its discretion.

### 2. CIV.R. 59(A)(6)

██ ██ The trial court, however, also cited Civ.R. 59(A)(6) and determined that the jury's verdict was not sustained by the weight of the evidence. When a party files a motion for a new trial asserting that the judgment is not sustained by the weight of the evidence, a duty devolves upon the trial court to review the evidence presented at trial and to pass upon the credibility of the witnesses and the evidence in general. *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 92, 52 O.O.2d 376, 381–382, 262 N.E.2d 685, 691–692. The trial court is in the best position to decide issues of fact and is therefore vested with broad discretion in ruling upon motions for new trial made pursuant to Civ.R. 59(A)(6). *Monroe v. Ohio Dept. of Rehab. & Corr.* (1990), 66 Ohio App.3d 236, 240, 583 N.E.2d 1102, 1104. As a result, the trial court's decision to grant a motion for a new trial based upon the weight of the evidence will be reversed on appeal only where the trial court abused its discretion in granting the motion. *Rohde, supra,* 23 Ohio St.2d at 90, 52 O.O.2d at 380, 262 N.E.2d at 690–691.

██ Nonetheless, a trial court may not set aside a jury verdict based upon a mere difference of opinion with the jury; to do so constitutes an abuse of discretion. *Id.* at 92, 52 O.O.2d at 381–382, 262 N.E.2d at 691–692. The jury's function is to weigh the evidence in the first instance, and a trial court may not usurp that function. *Id.* A reviewing court, however, must view the evidence favorably to the trial court's action rather than to the jury's verdict. *Jenkins v. Krieger* (1981), 67 Ohio St.2d 314, 21 O.O.3d 198, 423 N.E.2d 856. Thus, while the appellate court must give deference to a decision of the trial court respecting the weight of the evidence, the appellate court must also conduct an inquiry sufficient to ensure that the trial court has not encroached on the jury's factfinding function. *Bland v. Graves* (1993), 85 Ohio App.3d 644, 650, 620 N.E.2d 920, 923–924; *Miller v. Paulson* (1994), 97 Ohio App.3d 217, 224–225, 646 N.E.2d 521, 525.

R.C. 4112.99 authorizes a "civil action for damages * * * or any other appropriate relief." In *Rice, supra,* the Ohio Supreme Court interpreted the word "damages" in R.C. 4112.99 to include all legally recognized pecuniary damages, including compensatory and punitive damages. Compensatory damages for injuries generally include direct pecuniary loss, such as hospital and other medical expenses immediately resulting from the injury, or loss of time or money from the injury, loss due to the permanency of the injuries, disabilities or disfigurement, and physical and mental pain and suffering. See 4 Restatement of the Law 2d, Torts (1965) 453, Section 903 *et seq.*

In addressing damages, the trial court instructed the jury that they could award plaintiff compensatory damages including pain and suffering and mental anguish, future damages including loss of future earnings, and back pay. The jury returned with a verdict for plaintiff in the amount of $550,000. The record, however, does not disclose what portion of the award represents what damages, as the interrogatories given to the jury did not ask the jury to specify the amount awarded for each type of damages. Thus, while CCCA contends that the jury award was "an excessive and unfounded front pay award," the record does not indicate how the jury apportioned the damages awarded.

Plaintiff's claimed damages fall roughly into three categories:

a. Medical Damages and Pain and Suffering.[1]

Before his fall, plaintiff was unable to use the bathroom at CCCA because it was not wheelchair-accessible. Plaintiff intentionally would not drink liquids and would take Ditropan before he went to work so that he would not have to use a bathroom at CCCA. One day, while teaching a class, his bladder filled and put pressure on his bowel, forcing him to have a bowel movement in front of his class. He dismissed his class and had to leave early that night. At other times the unavailability of an accessible bathroom forced plaintiff to urinate in a bottle in his classroom while someone stood watch outside his door to make sure no one walked in on him. Similarly, plaintiff testified that the method of assisting him up and down the front stairs to get in the building was humiliating, degrading, and even dangerous.

Plaintiff's evidence showed he was injured by his fall at CCCA. After the fall, he suffered pain, numbness in his right side, and bladder-control problems. Plaintiff ultimately underwent two surgeries. One surgery removed a herniated disk in his back; the other removed rods placed in his back after his college fall and replaced them with other rods elsewhere in his back. Plaintiff testified to the extreme pain that he suffered from the surgeries, stating that the second surgery was the most painful surgery he had ever had and required months for him to recover. He also noted other side effects, such as headaches and numbness. Plaintiff's medical expenses, including the two surgeries, totaled just over $93,000, and each doctor who testified indicated that the charges incurred were proximately caused by the fall and were reasonable and necessary. Plaintiff testified that he continues to incur medical expenses and will do so for the near future, and that he was still suffering pain, although the surgeries had reduced the pain greatly.

---

1. CCCA does not contend that personal-injury damages are outside the scope of recoverable damages in a handicap-discrimination claim, and thus we do not address that issue.

b. Lifestyle Changes.

Plaintiff also testified that his injuries had affected his life. Before his fall, plaintiff described himself as a healthy, active, fully sufficient paraplegic. After the fall, he needed daily assistance in his everyday life. He stated that he had consistent bladder-control problems and would not go out for fear that he would smell like urine or urinate on himself. As a result, he wore diapers and spent $17 a week on them.

On cross-examination, however, plaintiff admitted that he had that type of bladder problem from his initial injury in college. He also admitted that he was taking a drug, Ditropan, before the fall to help him control his bladder problems. In fact, plaintiff admitted that before the fall at CCCA he suffered from many of the problems that he alleges resulted from that fall.

c. Compensation from Employment.

Plaintiff was making about $150 a month teaching at CCCA, or about $2,000 a year. He has not worked at CCCA since one week after his fall at CCCA and has not had another job since his fall.

 Given that testimony, the jury had sufficient evidence to award plaintiff medical expenses totaling approximately $93,000, back pay for the income that plaintiff lost from not working at CCCA, and an award for pain and suffering to date. The evidence regarding lifestyle changes, however, was questionable, as plaintiff ultimately admitted that the bulk of problems he experienced after his fall preexisted the fall at CCCA.

 Plaintiff's claims for future damages are not so well supported. To recover future damages, including future wage loss, plaintiff must prove by sufficient evidence that he is reasonably certain to incur such damages in the future. *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 425, 644 N.E.2d 298, 301. One element of proof necessary for a finding of future wage loss is the extent of the loss. The measure of damages for impairment of earning capacity is "the difference between the amount which the plaintiff was capable of earning before his injury and that which he is capable of earning thereafter." *Deyo v. Adjutant General's Dept.* (Aug. 16, 1994), Franklin App. No. 93API12–1667, unreported, 1994 WL 425003, quoting *Hanna v. Stoll* (1925), 112 Ohio St. 344, 353, 147 N.E. 339, 341–342. Plaintiff presented no testimony sufficient for a jury to calculate such an award. In fact, plaintiff simply testified that he has been unable to find another job, not that he could not work as he had before the fall.

 Similarly, plaintiff's claim of future pain and suffering lacks support in the record. Where the permanency of an injury is obvious, such as the loss of a limb, the jury may draw its own conclusions as to damages; however, where the injury is not obvious, expert evidence must be presented regarding the damage

sustained, the probability of future pain and suffering, or the permanency of the injury. *Corwin v. St. Anthony Med. Ctr.* (1992), 80 Ohio App.3d 836, 840–841, 610 N.E.2d 1155, 1157–1158; see, also, *Ratliff v. Colasurd* (Apr. 27, 1999), Franklin App. No. 98AP–504, unreported, 1999 WL 253002 (noting distinction in proving future damages between injuries objective and subjective in nature); *Day v. Gulley* (1963), 175 Ohio St. 83, 86, 23 O.O.2d 382, 384, 191 N.E.2d 732, 734–735.

■ The nature of plaintiff's injuries required him to present expert testimony to prove future pain and suffering. *Hughes v. Brogan* (Jan. 12, 1995), Franklin App. No. 94APE05–731, unreported, 1995 WL 12110 (finding expert testimony sufficient to prove future pain and suffering when plaintiff was hit by truck and suffered severe brain damage); see, also, *Union v. Clevenger* (July 7, 1988), Cuyahoga App. No. 54030, unreported, 1988 WL 87650 (finding that expert testimony was necessary to prove future damages from herniated disk); *Webster v. Oglebay Norton Co.* (Jan. 26, 1995), Cuyahoga App. No. 65502, unreported, 1995 WL 32628 (requiring expert testimony to prove future damages from back injury); cf. *Williams v. Noden* (Feb. 15, 1995), Summit App. No. 16857, unreported, 1995 WL 66356 (requiring expert testimony to prove future loss of earning capacity from herniated disk).

Plaintiff provided no such testimony from any of his experts that would demonstrate his future medical expenses or pain and suffering. To the contrary, Dr. Barkin, plaintiff's first urologist, told plaintiff to come back if he had any problems. Barkin did not see him after that time. Dr. Sybert, who operated on plaintiff's back, noted that he was improving and doing fine after the surgery.

■ In the final analysis, plaintiff's award of $550,000 was premised on his medical expenses and back pay totaling approximately $100,000, plus pain and suffering to the date of trial. Plaintiff failed to present the requisite testimony to support future wage loss, medical expenses, or pain and suffering. Construing the evidence, then, in favor of the trial court's decision to grant a new trial, we cannot say that the trial court wrongly ascertained that plaintiff's evidence on pain and suffering was not sufficient to warrant the extra damages the jury awarded plaintiff. Because the trial court's decision was not an abuse of discretion, plaintiff's first assignment of error is overruled, and plaintiff's second assignment of error is rendered moot as a result of our disposition of plaintiff's first assignment of error.

### F. CCCA'S CROSS–APPEAL

Given our disposition of plaintiff's first and second assignments of error, we now address the assignments of error raised in CCCA's cross-appeal. In its first assignment of error, CCCA alleges that the trial court erred when it did not

grant its motions for summary judgment and for directed verdict on plaintiff's claims for handicap discrimination, front pay, and an unpleaded negligence claim.

## 1. PLAINTIFF'S CLAIMS AGAINST CCCA

CCCA first raises an issue as to an unpleaded negligence claim. As CCCA admits, however, that plaintiff alleged no such claim, and no negligence instruction was given to the jury for its consideration. That portion of CCCA's first assignment of error is moot.

CCCA next contends that plaintiff was not entitled to an award of front pay on his handicap-discrimination claim, and that in any event the jury's verdict was an excessive front pay award. CCCA attempts to premise its contention on the juror's affidavit submitted with its motion for a new trial.

■■■ "[F]ront pay is an equitable remedy designed to financially compensate employees where 'reinstatement' of the employee would be impractical or inadequate. In such circumstances an award of front pay enables the court to make the injured party whole, although reinstatement is the preferred remedy. [A]s an equitable remedy, it is left to the sound discretion of the trial court to determine whether front pay is appropriate under the circumstances of the case. If it is determined that front pay is an appropriate remedy, then the jury should determine the amount of damages." (Citations Omitted.) *Worrell v. Multipress, Inc.* (1989), 45 Ohio St.3d 241, 246, 543 N.E.2d 1277, 1282; *Miller v. BancOhio Natl. Bank* (Apr. 23, 1991), Franklin App. No. 90AP–380, unreported, 1991 WL 64907.

■■■ As noted earlier, the juror's affidavit is incompetent evidence to impeach the jury verdict without some other evidence of alleged improper conduct. Evid.R. 606(B); *Schiebel, supra.* Plaintiff presents no other evidence, and interrogatories submitted to the jury did not ask for a breakdown of the damages. Because CCCA has presented no competent evidence to demonstrate that the jury's verdict represents any award of front pay, much less an excessive award, that portion of CCCA's assignment of error dealing with a front pay award is overruled.

The trial court, without discussion, denied CCCA's motion for summary judgment on plaintiff's handicap-discrimination claim; it also denied a directed verdict on the same claim. CCCA argues on appeal that the court erred because plaintiff failed to file a charge with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC") and because plaintiff failed to set forth a prima facie case of handicap discrimination.

■■■ CCCA's argument that plaintiff was required to file a charge with the EEOC is not well taken. While plaintiff was required to file a charge with

various agencies before he could pursue a federal discrimination claim, plaintiff has not alleged a federal discrimination claim: his claims all arise under R.C. Chapter 4112, Ohio's antidiscrimination laws. Any prerequisites to the filing of a federal claim are irrelevant to plaintiff's claims.

 CCCA also argues that plaintiff failed to present sufficient evidence to set forth a prima facie case of discrimination. To defend a summary judgment motion against a handicap-discrimination claim, a plaintiff should demonstrate that a genuine issue of material fact exists as to whether "(1) he is handicapped, (2) action was taken by his employer (at least in part) because he was handicapped, and (3) even though plaintiff is handicapped, he can safely and substantially perform the essential functions of the job in question with reasonable accommodations." *Wooten, supra,* 91 Ohio App.3d at 332, 632 N.E.2d 605, 608–609, citing *Hazlett v. Martin Chevrolet, Inc.* (1986), 25 Ohio St.3d 279, 496 N.E.2d 478. There was never any question that plaintiff was handicapped for purposes of R.C. Chapter 4112.

 CCCA contends that plaintiff cannot prove that any adverse employment action was taken against him. While plaintiff admitted that he was never demoted, disciplined, or fired from CCCA, the trial court denied CCCA's motion for a directed verdict on the grounds that its *inaction* could be considered in setting forth a prima facie case of discrimination.

R.C. 4112.02(A) does not require that the employee be fired or demoted. Rather, it is illegal "to discharge without just cause, to refuse to hire, *or otherwise to discriminate against that person* with respect to hire, tenure, terms, *conditions, or privileges of employment,* or any matter directly or indirectly related to employment." (Emphasis added.) Plaintiff presented evidence that demonstrated that he was unable to use the bathroom at CCCA while he was working there and that instead he was forced to use a bottle in his classroom with someone at the door to keep others out. No one else at CCCA had to do so if they wanted to use a bathroom. Plaintiff's testimony alone presents a genuine question of fact under the second prong of plaintiff's prima facie case.

CCCA also contends that plaintiff failed to request or articulate reasonable accommodations. To the contrary, in his three years at CCCA, plaintiff requested that (1) a lift be put in for the front door, (2) the water fountain be made accessible by placing paper cups on the side, (3) the bathroom doorway be modified, or the two bathrooms be made into one big bathroom, and (4) the ramp near the stage be modified. During his tenure as teacher, CCCA lowered his mailbox, moved furniture so he could get around the building, and had people at his disposal run errands for him.

CCCA next contends that plaintiff cannot show that the accommodations he requested of CCCA were reasonable. Access to a job is a reasonable accommodation. Ohio Adm.Code 4112–5–08(E)(2). Accommodations for handicapped workers are unreasonable only if they place an undue hardship on the employer, who carries the burden of showing undue hardship. *Wooten, supra,* 91 Ohio App.3d at 334, 632 N.E.2d at 610. In determining whether an accommodation would result in undue hardship to an employer, the following factors may be considered: (1) business necessity; (2) the financial cost and expense where the costs are unreasonably high in view of the size of the employer's business, the value of the disabled employee's work, the potential that the cost can be included in planned remodeling or maintenance, and the requirements of other laws and contracts; and (3) other appropriate considerations that the employer can support with objective evidence. Ohio Adm.Code 4112–5–08(E)(3).

*Wooten* belies CCCA's contentions, because plaintiff did not have the burden to prove that his requested accommodations were reasonable; CCCA had the burden to show that the requested accommodations were unreasonable. CCCA failed to present such evidence. Accordingly, the trial court did not err in denying CCCA's motion for summary judgment on plaintiff's handicap-discrimination claim.

CCCA also requested a directed verdict on plaintiff's discrimination claim after plaintiff had rested his case. Viewing the evidence in the light most favorable to plaintiff, the evidence presented at trial permits reasonable minds to come to differing conclusions on the accommodation issue. *Sanek, supra,* 43 Ohio St.3d at 172, 539 N.E.2d 1114, 1116–1117. A witness who deals with handicap-accessibility standards testified that potential accommodations included replacing the stairs in front of the building with a ramp, removing the steep ramp in the stage area with a lift costing five to six thousand dollars, and merging the two existing bathrooms into one unisex bathroom.

Pat Williamson, executive director of CCCA, testified that it received $376,000 in funding from the city in 1988. She further testified that after paying CCCA's expenses, such as payroll and other operating expenses, CCCA lacked sufficient money to move to a handicap-accessible facility. She, however, did not say that the suggested accommodations would have been impractical to implement.

This evidence allowed jurors to come to differing conclusions concerning the reasonableness of plaintiff's requested accommodations, especially in view of (1) CCCA's burden to show that the accommodations requested were unreasonable and (2) its failure to present any testimony showing the actual cost of any of the accommodations. The trial court properly denied CCCA's motion for directed verdict on plaintiff's handicap-discrimination claim.

For the foregoing reasons, CCCA's first assignment of error is overruled.

## 2. CCCA'S COUNTERCLAIM

In its seventh assignment of error, CCCA contends that the trial court erred in dismissing its counterclaim for plaintiff's breach of loyalty. The trial court granted plaintiff's motion for a directed verdict on the claim.

CCCA claimed that plaintiff breached his duty of loyalty to CCCA when he allegedly gave a security code to his friends so they could gain access to the building to videotape the premises. Plaintiff admitted that he asked a friend to videotape the outside and inside of the building. Plaintiff was not present at the taping, and he did not know how his friends accomplished the task or gained access to the building.

An employee owes his or her employer a duty to act "in the utmost good faith and loyalty toward his * * * employer." *Connelly v. Balkwill* (1954), 160 Ohio St. 430, 440, 116 N.E.2d 701, 706–707. CCCA presented no evidence to show a breach of that duty. For example, ordinarily employees are considered to be in breach of their duty of loyalty if they compete with their employer. *Goal Sys. Intl. v. Klouda* (Oct. 10, 1985) Franklin App. No. 84AP–168, unreported, 1985 WL 10461. No evidence suggested that plaintiff was competing against CCCA. Rather, CCCA speculates that plaintiff breached the duty because plaintiff must have given his friends a security code to gain access to the building for videotaping. CCCA presented no evidence to support that speculation. The trial court did not err in granting plaintiff's motion for directed verdict on CCCA's claim of breach of duty of loyalty.

CCCA's seventh assignment of error is overruled.

## 3. JURY INSTRUCTIONS

CCCA's next four assignments of error deal with the instructions that were given to the jury at the end of the case. CCCA's second and third assignments of error relate to the trial court's procedure both for creating jury instructions and allowing counsel to object to the instructions given. Because the procedure will be more controlled in the new trial, CCCA's second and third assignments of error are not likely to be repeated and are therefore moot. App.R. 12(A)(1)(c).

CCCA's fourth assignment of error contends that the trial court erred in failing to give its requested instruction on mitigation of damages. Because the issue may be pertinent in a new trial, we address it. The trial court refused to give the instruction because it found no evidence presented on the issue of mitigation of damages. CCCA objected to the trial court's refusal to give the instruction.

A court ordinarily should give requested jury instructions where they are correct statements of the law as applied to the facts in the case and where the

evidence would allow reasonable minds to reach the conclusion sought by the instruction. *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828, 832. In Ohio, one who has been wrongfully discharged must minimize his or her damages by seeking further employment. *State ex rel. Martin v. Columbus* (1979), 58 Ohio St.2d 261, 12 O.O.3d 268, 389 N.E.2d 1123. The discharged employee is not required to accept employment that is in a different locale or dissimilar to the job he or she had previously held. *Id.* at 264, 12 O.O.3d at 269–270, 389 N.E.2d at 1124–1125, citing *James v. Allen Cty.* (1886), 44 Ohio St. 226, 6 N.E. 246. However, a wrongfully excluded employee's duty to mitigate his damages requires that the employee use ordinary diligence to obtain similar employment in the same vicinity. *Id.* Mitigation of damages is in the nature of an affirmative defense, and the employer responsible for the wrongful exclusion has the burden of proof on that issue. *Id.*

 CCCA argued in the trial court that plaintiff did not make reasonable efforts to get another job after he recovered to the extent possible from his injury at CCCA. Plaintiff testified that after his accident, he completed his master's degree at OSU and applied for teaching positions at fine arts departments in various universities. In 1997, he went to a conference in Canada where he applied for ten positions at different universities. Although he had one second interview, he did not get that job. Plaintiff was still looking for a job with help from the Ohio Bureau of Vocational Rehabilitation, but he had not sent out any job applications because his counselor at the bureau was helping him with the job search. Nor had he had any interviews since working with the counselor.

Because the testimony permits reasonable minds to come to differing conclusions about plaintiff's efforts to mitigate his damages and use ordinary diligence in obtaining another position, jury instructions stating the correct law of mitigation may be warranted in a new trial. CCCA's fourth assignment of error is sustained.

CCCA's fifth assignment of error contends that the trial court erred in giving instructions on personal injury damages and future damages. CCCA contends that a jury instruction on personal injuries was not proper because plaintiff had already recovered those damages from his workers' compensation claim. Asserting that plaintiff is not entitled to a double recovery, CCCA contends that those damages should be offset from any verdict awarded against it. According to plaintiff's testimony, his workers' compensation claim paid for his medical bills and his surgeries, and he has received at a minimum $800 every two weeks for wage compensation from workers' compensation.

 CCCA's argument is not well taken. Pursuant to *Pryor v. Webber* (1970), 23 Ohio St.2d 104, 52 O.O.2d 395, 263 N.E.2d 235 "[t]he collateral source

rule is an exception to the general rule of compensatory damages in a tort action, and evidence of compensation from collateral sources is not admissible to diminish the damages for which a tortfeasor must pay for his negligent act." *Id.* at paragraph two of the syllabus. Workers' compensation is such a collateral source, and evidence of such recovery is not properly admitted to the jury. *Id.* at 109, 52 O.O.2d 395, 397–398, 263 N.E.2d 235, 238–239.

In an effort to abrogate the collateral source rule of *Pryor,* the General Assembly enacted R.C. 2317.45 as part of the Tort Reform Act of 1987. Am.Sub. H.B. No. 1. However, the Ohio Supreme Court found that statute to violate the Ohio Constitution. *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 427, 633 N.E.2d 504, 513–514. The General Assembly again attempted to accomplish that end in its recent attempt at tort reform, 1996 Am.Sub.H.B. No. 350, and the Supreme Court again found the statute to be unconstitutional. *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 479–482, 715 N.E.2d 1062, 1087–1089. Therefore, the collateral-source rule as set forth in *Pryor* continues to preclude the mention of any collateral benefits plaintiff recovered. The trial court's instruction was proper.

CCCA does not explain why it was improper for the trial court to give its future-damages instruction. Nonetheless, as noted, plaintiff failed to present sufficient evidence of the future lost wages. In the retrial, plaintiff must present such evidence to warrant an instruction on that issue. *Murphy, supra.* CCCA's fifth assignment of error is overruled.

4. JURY INTERROGATORIES

CCCA next contends, in its sixth assignment of error, that the trial court erred when it refused to submit jury interrogatories on the issue of damages. Because the issue may arise in a new trial, we address it. CCCA originally submitted twenty-six requested jury interrogatories. Of the twenty-six, six related to the elements of plaintiff's claim for handicap discrimination, and six related to damages for the same claim. The damages interrogatories asked about amounts calculated for back pay, future damages, mitigation of damages, and humiliation and pain and suffering. Plaintiff submitted fourteen jury interrogatories. Of those fourteen, five related to plaintiff's handicap-discrimination claim, and four only to damages.

The trial court submitted only four interrogatories to the jury; none of them related to the damages award. Rather, the interrogatories asked the jury only whether the elements of plaintiff's handicap-discrimination claim had been satisfied. The trial court refused the damages interrogatories that CCCA requested because it found them confusing. CCCA objected to the trial court's decision not to submit any of its requested damages interrogatories.

Civ.R. 49(B), which governs the use of jury interrogatories, provides:

"The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law."

Although Civ.R. 49(B) mandates that a trial court submit interrogatories to the jury once requested to do so, the court retains limited discretion to reject submission of the interrogatories where the request is untimely or the proposed interrogatories are ambiguous, confusing, redundant, or otherwise legally objectionable. *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 107, 592 N.E.2d 828, 835–836; *Ziegler v. Wendel Poultry Serv., Inc.* (1993), 67 Ohio St.3d 10, 15, 615 N.E.2d 1022, 1028, overruled on other grounds, *Fidelholtz v. Peller* (1998), 81 Ohio St.3d 197, 690 N.E.2d 502, syllabus. As the Ohio Supreme Court stated, Civ.R. 49(B) does not require that the "trial judge [act as] a mere conduit who must submit all interrogatories counsel may propose. Authority is still vested in the judge to control the substance and form of the questions, and if the interrogatories are not based on the evidence, are incomplete, ambiguous or otherwise legally objectionable, the judge need not submit them to the jury." *Ragone v. Vitali & Beltrami, Jr., Inc.* (1975), 42 Ohio St.2d 161, 165–166, 71 O.O.2d 164, 166–167, 327 N.E.2d 645, 648–649. The trial court's decision not to submit CCCA's interrogatories on damages will be reversed only on a showing of the abuse of the court's discretion. *Freeman v. Norfolk & W. Ry. Co.* (1994), 69 Ohio St.3d 611, 614, 635 N.E.2d 310, 313–314; *Ziegler, supra,* 67 Ohio St.3d at 15, 615 N.E.2d at 1028.

Proper jury interrogatories lead to "findings of such a character as will test the correctness of the general verdict returned and enable the court to determine as a matter of law whether such verdict shall stand." *Freeman, supra,* 69 Ohio St.3d at 613–614, 635 N.E.2d at 313–314, quoting *Bradley v. Mansfield Rapid Transit, Inc.* (1950), 154 Ohio St. 154, 160, 42 O.O. 221, 223–224, 93 N.E.2d 672, 676–677 overruled on other grounds, *Bahm v. Pittsburgh & Lake Erie Rd. Co.* (1966), 6 Ohio St.2d 192, 35 O.O.2d 307, 217 N.E.2d 217. They must address determinative issues and must be based on the evidence presented. *Id.* Determinative issues are "ultimate issues which when decided will definitely settle the entire controversy between or among the parties so as to leave nothing for the court to do but enter judgment for the party or parties in whose favor such determinative issues have been resolved by the jury." *Ziegler, supra,* 67

Ohio St.3d at 15, 615 N.E.2d at 1028, quoting *Miller v. McAllister* (1959), 169 Ohio St. 487, 494, 160 N.E.2d 231; see, also, *Continental Ins. Co. v. G & W Constr., Inc.* (June 30, 1997), Franklin App. No. 96APE11–1597, unreported, 1997 WL 360879. An interrogatory that is merely probative or evidentiary in nature is improper. *Freeman, supra,* 69 Ohio St.3d at 614, 635 N.E.2d at 313–314; *Clark v. Doe* (1997), 119 Ohio App.3d 296, 304–305, 695 N.E.2d 276, 281 (finding no abuse of discretion in not submitting requested jury interrogatories where they did not address determinative issues and were only evidentiary in nature).

■ The requested jury interrogatories all went to the issue of damages, a proper subject for interrogatories. See *Balbach v. Akron Metro. Hous. Auth.* (Feb. 6, 1987), Summit App. No. 12292, unreported, 1987 WL 6663 (allowing jury interrogatories to be submitted to determine amount of damages awarded under each theory of recovery); *Powers v. Jayne* (Mar. 18, 1996), Licking App. No. 95–CA–54, unreported, 1996 WL 132304. Moreover, because the interrogatories were clear, the trial court abused its discretion in not submitting CCCA's damages interrogatories. CCCA's sixth assignment of error is sustained.

Having overruled plaintiff's first, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, and eleventh assignments of error and cross-appellant CCCA's first, fifth, and seventh assignments of error, having sustained cross-appellant CCCA's fourth and sixth assignments of error, and having rendered moot plaintiff's second assignment of error and cross-appellant CCCA's second and third assignments of error, we affirm in part and reverse in part the judgment of the trial court and remand this matter to the trial court for further proceedings consistent with this opinion.

*Judgment affirmed in part
and reversed in part,
and cause remanded.*

BOWMAN and TYACK, JJ., concur.