OPINION
{¶ 1} Defendant-appellant/cross-appellee Doris Pauline Kemp appeals the April 21, 2004 Judgment Entry of the Coshocton County Court of Common Pleas in favor of plaintiffappellee/cross-appellant, Ronald Taylor. Taylor cross appeals that portion of the Judgment Entry in favor of Kemp.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Prior to their marriage on September 28, 1992, Ralph E. Kemp and Doris Pauline Kemp executed a prenuptial agreement on July 10, 1992. No children were born of the marriage, but Ralph had a stepson, Ronald Taylor, from a previous marriage.
 {¶ 3} On September 22, 2000, Ralph, who was in poor health, executed a power of attorney to Doris. On September 26, 2000, Doris used the power of attorney to close three bank accounts titled in Ralph's name, the proceeds of which totaled approximately $82,000. She deposited the proceeds in a separate bank account solely in her name.
 {¶ 4} Ralph died on September 26, 2000. However, prior to his death and prior to executing the power of attorney, Ralph Kemp established or changed the beneficiary designations on several payable on death bank accounts, making Doris the beneficiary.
 {¶ 5} On October 2, 2000, Doris Kemp applied to the Probate Court to be appointed as Administrator of the Estate of Ralph Kemp, alleging Ralph died intestate. Doris did not inform the probate court of the premarital agreement, nor did she report the $82,000 generated as proceeds of the bank accounts she closed on September 26, 2000, to the probate court in her administration of the estate.
 {¶ 6} On February 11, 2001, Ronald Taylor filed a motion to remove Doris as administrator and for appointment of a successor. On April 16, 2001, the court removed Doris Kemp as administrator, and appointed Attorney Timothy France. On August 24, 2001, Taylor applied to probate a lost, spoliated or destroyed will. On February 28, 2002, a copy of a 1956 will of Ralph Kemp was admitted to probate. The 1956 will named Ralph's first wife, Ethel, as his sole heir and Ronald Taylor as the sole contingent beneficiary. As a result, Taylor was appointed executor of Ralph Kemp's estate on March 25, 2002.
 {¶ 7} On March 28, 2002, Taylor filed a statutory action pursuant to R.C. 2109.50 against Doris Kemp. On July 25, 2002, the probate court entered judgment on the petition ordering the $82,000 withdrawn by Doris Kemp pursuant to her power of attorney be returned to the estate. The probate court denied the balance of the request for recovery, including $229,000 in the payable on death accounts.
 {¶ 8} On May 3, 2002, Ronald Taylor, individually, and Floyd Kemp filed a civil action in the court of common pleas seeking damages caused by Doris Kemp as a result of fraud, fraudulent conveyance, conversion and intentional interference with the expectancy of inheritance. On February 10, 2003, they amended their complaint adding Karma Miller and Allen Bickel as defendants. On November 17, 2003, Floyd Kemp voluntarily dismissed his claims against all parties, leaving Ronald Taylor as the sole plaintiff.
 {¶ 9} On January 16, 2004 and January 22, 2004, the matter proceeded to a bench trial. On April 21, 2004, via Judgment Entry, the trial court granted judgment in favor of appellee/cross-appellant Taylor against appellant/cross-appellee Doris Pauline Kemp in the amount of $270,000, and dismissed the complaint as to Bickel and Miller. The trial court further denied appellee/cross-appellant Taylor's demand for punitive damages and attorney fees. On July 23, 2004, the trial court entered findings of fact and conclusions of law, which both parties stipulated to being transmitted to this Court for inclusion in the appellate record.
 {¶ 10} It is from the April 21, 2004 Judgment Entry of the Coshocton County Court of Common Pleas both parties now appeal.
 {¶ 11} Appellant/cross-appellee Doris Kemp assigns as error:
 {¶ 12} "I. The trial court committed prejudicial error when it permitted hearsay testimony about ralph kemp's `probate avoidance and tax avoidance plan.'
 {¶ 13} II. The trial court's conclusion that doris kemp's breach of promise related to the pod bank accounts is not supported by the evidence.
 {¶ 14} "III. The trial court's conclusion that doris kemp committed fraud by her promise of future conduct regarding the pod accounts is error as a matter of law.
 {¶ 15} "IV. The trial court's conclusion that ronald taylor had a reasonably certain expectation of `inheritance' as it relates to the $229,000 in pod accounts is not supported by the evidence.
 {¶ 16} "V. The trial court's conclusion that the plaintiff can recover non-probate assets by demonstrating the tort of `intentional interference with expectancy of inheritance' is error as a matter of law."
 I {¶ 17} In the first assignment of error, appellant/cross-appellee maintains the trial court committed prejudicial error when it permitted Attorney Paul Miller's hearsay testimony concerning Ralph Kemp's "probate avoidance and tax avoidance plan."
 {¶ 18} Appellant/cross-appellee cites the following exchange at trial during examination of Attorney Paul Miller:
 {¶ 19} "Q. Did you participate in the implementation of the probate avoidance and tax avoidance plan in any respects with regard to the Belmont County real estate?
 {¶ 20} "A. Yes. That was then a second item of discussion.
 {¶ 21} "Q. All right. And what was the plan there? Was it any different from the plan with Nellie, or was it the same?
 {¶ 22} "A. No, that was very different in that that property — he wanted that property to eventually —
 {¶ 23} "MR. WRIGHT: Object.
 {¶ 24} "THE COURT: What is the basis for your objection Mr. Wright?
 {¶ 25} "MR. WRIGHT: Hearsay. I think the court's ruled and this would go back to the testimony of any statements made by the decedent.
 {¶ 26} "THE COURT: The question was: `Did he express an intent as to what he wanted done with the Belmont property?' The witness may testify as to what he heard. The objection is overruled. You may answer.
 {¶ 27} "A. He wanted the Belmont property to go to his stepson, Ron Taylor, whom I had never met before but I saw his name in the will.
 {¶ 28} "Q. And that understanding was based on the conversations you had with him and directives that you had received from him?
 {¶ 29} "A. That's true.
* * *
"Q. Were there any discussions in your presence about the plan with the Belmont County property and the ultimate beneficiary and what was to happen as far as the transfer of the property?
 {¶ 30} "A. Yes, we did discuss that and —
 {¶ 31} "Q. — I would caution you not to say what Mr. Kemp said but what your understanding of the arrangement was to be as far as transfer.
 {¶ 32} "A. My understanding was that the property was jointly titled with the specific understanding that at some time in the future if Pauline Kemp survives him, that it would be surveyed and transferred to Ronald Taylor, the stepson.
 {¶ 33} "Q. To what extent did you hear any discussions between Mr. and Mrs. Kemp regarding this arrangement, and I'm interested in any comments Mrs. Kemp might have made to Mr. Kemp in that setting.
 {¶ 34} "A. I was reluctant with this option that they chose, and we had extensive discussion. And Mrs. Kemp expressed no interest whatsoever in his property and also convinced me that she understood what her role would be as a fiduciary in carrying out this plan.
 {¶ 35} "Q. Did she make any comments to Mr. Kemp about this plan?
 {¶ 36} "A. Yes, she did.
 {¶ 37} "Q. What did she say?
 {¶ 38} "Q. `I will do whatever you ask me to do.'
 {¶ 39} "Q. During this process, did Mrs. Kemp make any statements to you out of the presence of Mr. Kemp?
 {¶ 40} "A. Yes, she did.
 {¶ 41} "Q. And what were the circumstances there?
 {¶ 42} "A. As I specifically recall, he excused himself from my conference room and went to the restroom. And it was on that occasion that I took the opportunity to talk to Mrs. Kemp about the decision he is about to make. And, at least from my perspective, I tried to emphasize the weightiness of the responsibility and to which I received affirmation, at least to my satisfaction, that she would do that.
 {¶ 43} "Q. Now, then did these discussions occur, again, just in general time, the discussions about the Nellie and the Belmont County? Is this all happening at the same time?
 {¶ 44} "A. Yes. Approximately the same time. See, one of the issues in the Nellie life estate was that I think there was also discussion with regard to Mrs. Kemp's estate, which was, from my perspective, always considered a separate situation. But there was discussion, as I recall, on the part of Mrs. Kemp, about transferring her assets, of which I didn't know what all the details were, but I was led to believe that it's real estate near Fender's Fish Hatchery and so forth, that she may be transferring it to her children. And if they live together in Nellie, well, at least my discussion with her with them was maybe she would be out of a home or something if he would die or whatever. And I think that's one of the reasons that we began to discuss that that should just be transferred to her outright.
 {¶ 45} "Q. And, as I recall, you said those discussions were in the spring of 2000?
 {¶ 46} "A. Yes, they were.
 {¶ 47} "Q. And did you participate in the implementation of any probate and tax avoidance plan by assisting Mr. Kemp with any other assets?
 {¶ 48} "A. No, I did not. Other than just a discussion — I think we did discuss forms of ownership.
 {¶ 49} "Q. Did you inquire as to whether you were to assist with the probate and tax avoidance plan with any other assets, like bank accounts?
 {¶ 50} "A. I don't know whether I specifically asked whether he wants my services, but I was advised that there were other assets, but I did not know the extent or know the dollar amount of those or the value.
 {¶ 51} "Q. In your discussion, did you advise how those assets could also be set up as nonprobate type transfers?
 {¶ 52} "A. I think we talked about that, yes." Tr. at 169-170, 172-175.
 {¶ 53} Appellant/cross-appellee cites Evidence Rules 802, 804 and 805 arguing Attorney Miller's testimony constitutes inadmissible hearsay. We disagree.
 {¶ 54} Generally, the admission or exclusion of relevant evidence rests within the sound discretion of the trial court.State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. Therefore, we will not disturb a trial court's evidentiary ruling unless we find the trial court abused its discretion. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Adams
(1980), 62 Ohio St.2d 151, 157.
 {¶ 55} Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Where an out-of-court statement is offered without reference to its truth, it is not hearsay. State v.Lewis (1970), 22 Ohio St.2d 125, 132-133.
 {¶ 56} We conclude the trial court did not err in admitting Attorney Miller's testimony. The statements at issue were not offered by appellee/cross-appellant to prove the truth of the matters asserted, but, rather, were offered to explain the actions of Ralph Kemp. The statements were therefore not hearsay, see Evid.R. 801(C), and they were relevant, as they pertained to the actions preceding Ralph Kemp's death. See, Williams v.Franklin Cty. Bd. of Commrs. (2001), 145 Ohio App.3d 530.
 {¶ 57} The first assignment of error is overruled.
 II, III, IV {¶ 58} Appellant's second, third, and fourth assignments of error raise common and interrelated issues; therefore, we will address the assignments together.
 {¶ 59} Appellant/cross-appellee maintains there is insufficient evidence Doris Kemp breached a promise related to the POD bank accounts, and the trial court erred in finding Doris committed fraud by her promise of future conduct regarding those accounts. Therefore, appellant maintains the conclusion Taylor had a reasonable expectation of inheritance in the POD accounts is against the manifest weight of the evidence.
 {¶ 60} We agree with appellant/cross-appellee there is insufficient evidence to support the trial court's conclusion Doris breached a promise with regard to the POD bank accounts. Upon our review, we find no evidence supporting the trial court's finding Doris breached a promise with regard to the POD accounts, nor does appellee/cross-appellant cite any evidence apart from the evidence set forth, supra. Ralph himself changed the beneficiary designations in June and July 2000. The power of attorney to Doris was not executed until September, 2000. Accordingly, Doris did not utilize her power of attorney in changing the beneficiary designations, and there is no evidence she otherwise fraudulently induced Ralph into making the changes relative to the POD accounts. Despite the trial court's findings of fraud due to Doris' other actions, there is no evidence of fraud with regard to the POD accounts.
 {¶ 61} Accordingly, appellant's second, third, and fourth assignments of error are sustained.
 V {¶ 62} Based upon our disposition of appellant/cross-appellee's second, third, and fourth assignments of error, the fifth assignment of error is overruled as moot.
 {¶ 63} We now turn to appellee/cross-appellant's assignments of error:
 {¶ 64} "I. The trial court's failure to award the reduction of stock value from the date of ralph kemp's death to the date of delivery to ronald taylor as executor of the estate is error as a matter of law.
 {¶ 65} "II. The trial court's failure to award punative [sic] damages and attorney fees is not supported by the evidence.
 {¶ 66} "III. The trial court's failure to find alan bickel and karma miller jointly and severally liable to plaintiff is error as a matter of law.
 I, II {¶ 67} Appellee/cross-appellant's first and second assignments of error raise common and interrelated issues; therefore, we will address the assignments together.
 {¶ 68} Appellee/cross-appellant maintains the trial court erred as a matter of law in failing to award him monetary damages for the reduction in stock value from the date of Ralph Kemp's death to the date of delivery. He further maintains the trial court erred in failing to award him punitive damages and attorney fees.
 {¶ 69} Appellee/cross-appellant asserts the reduction in the value of the stock due to a declining market was foreseeable and due to appellant/cross-appellee's fraud. He further asserts there is clear and convincing evidence appellant/cross-appellee's acts or failure to act demonstrated malice, aggravated or egregious fraud, oppression, or insult, and he has presented proof of actual damages resulting from those acts or failure to act.
 {¶ 70} We will not disturb a decision of the trial court as to a determination of damages absent an abuse of discretion."Roberts v. U.S. Fid. Guar. Co. (1996), 75 Ohio St.3d 630,634, 665 N.E.2d 664, citing Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 450 N.E.2d 1140. Again, in order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore at 219,450 N.E.2d 1140. It is possible, in awarding an amount of compensatory damages less than requested by appellants, the trial court found appellants' claimed damages to be speculative and not supported by the evidence. The value of stock often goes up or down over time. As such, damages based on a reduction in value because of delay are inherently speculative. Therefore, upon review of the record, we do not find the trial court abused its discretion in its award of compensatory damages.
 {¶ 71} The decision whether to award punitive damages is within the trial court's discretion and, absent an abuse of discretion; the court's ruling will be upheld. Ohio law provides that an award of punitive damages is available only upon a finding of actual malice. Berge v. Columbus Community CableAccess (1999), 136 Ohio App.3d 281, 316, 736 N.E.2d 517. The "actual malice" necessary for purposes of an award of punitive damages has been defined as "`(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" Id., quoting Preston v. Murty
(1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, at syllabus.
 {¶ 72} In its decision, the trial court concluded punitive damages were not warranted in this case. Upon review, we find the trial court did not abuse its discretion in refusing to award punitive damages.
 {¶ 73} Appellee/cross-appellant's first and second assignments of error on crossappeal are overruled.
 III {¶ 74} In his third assignment of error, appellee/cross-appellant argues the trial court erred as a matter of law in failing to find Allen Bickel and Karma Miller jointly and severally liable. Initially, we note we cannot re-weigh the evidence and must defer to the findings of the trial judge who is best able to weigh the credibility of the evidence by viewing the witnesses and observing their demeanor.
 {¶ 75} A review of the trial record indicates Karma Miller merely assisted her mother by driving her to financial institutions and waiting while her mother was dealing with the bank clerks. Accordingly, the trial court did not err in not finding Karma Miller jointly and severally liable, whereas the evidence does not demonstrate she engaged in tortuous activity.
 {¶ 76} As to Allen Bickel, the record is again insufficient to demonstrate his involvement in tortuous conduct. Again, it is for the trial court to weigh the evidence and to judge the credibility of witnesses. The trial court certainly could have deemed credible Mr. Bickel's testimony regarding his not being involved in the burning of the will, and did not err in failing to find him jointly and severally liable.
 {¶ 77} Therefore, we conclude the trial court did not err as a matter of law in failing to find Bickel and Miller jointly and severally liable, as a review of the record demonstrates there is insufficient evidence to support such finding.
 {¶ 78} The third assignment of error on cross-appeal is overruled.
 {¶ 79} The Judgment Entry of the Coshocton County Court of Common Pleas is reversed and remanded for further proceedings in accordance with the law and this opinion.
Hoffman, J., Boggins, P.J. and Gwin, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the Judgment Entry of the Coshocton County Court of Common Pleas is reversed and this matter is remanded to the trial court for further proceedings in accordance with the law and this opinion. Costs divided equally.